# ROYCE HOMES, L.P.

## CERTIFICATE

I, the undersigned, do hereby certify that I am a duly elected, qualified, and acting officer of Hammersmith Group, Inc., a Delaware corporation, the sole general partner of **ROYCE HOMES, L.P.**, a Delaware corporation ("Royce Homes"), and that I am authorized to execute and deliver this certificate, and I do hereby further certify as follows:

1.  Certificate of Limited Partnership, Certificate of Filing and Application for Registration As a Foreign Limited Partnership. Attached hereto as Exhibit "A" is a true and complete copy of the Certificate of Limited Partnership, Certificate of Filing and Application for Registration As a Foreign Limited Partnership of Royce Homes, which Certificate of Limited Partnership, Certificate of Filing and Application for Registration As a Foreign Limited Partnership have not been amended (except as reflected in any attachments hereto) or revoked and are now in full force and effect.

2.  First Amended and Restated Agreement of Limited Partnership of Royce Homes, L.P. Attached hereto as Exhibit "B" is a true and complete copy of the First Amended and Restated Agreement of Limited Partnership of Royce Homes, L.P, which First Amended and Restated Agreement of Limited Partnership of Royce Homes, L.P. has not been amended (except as reflected in any attachments hereto) or revoked and is now in full force and effect.

IN WITNESS WHEREOF, I have duly executed this certificate as of September 20, 2006.

By:     Hammersmith Group, Inc., its general partner

By: _____
John H. Speer
President

List of Exhibits
Exhibit "A" – Certificate of Limited Partnership, Certificate of Filing and Application for Registration As a Foreign Limited Partnership

J6171.54.wpd

Exhibit "B" – First Amended and Restated Agreement of Limited Partnership of Royce Homes, L.P.

8/13/2010                    Amegy Bank Production                    0074083
AMEGY007385
                                                            EXHIBIT A ORIGINAL COMPLAINT

Exhibit "A"

Certificate of Limited Partnership, Certificate of Filing and Application for Registration As a Foreign Limited Partnership

J6171.54.wpd                                    -3-

State-of Delaware

*Office* of the Secretary of State

I, EDWARD J. **FUEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT** *COPY* OF *THE CERTIFICATE OF* LIMITED PARTNERSHIP OF "ROYCE HOMES, L_P.", FILED IN TnIS'O FICE ON THE THIRTIETH DAY OF JUNE, A.D. 1998, AT 12:30'O'CLOCK,P.'℮





_Edward J. Fred, Secretary of State_

AUTHENTICA.770NT:

DATE:

9175572

07—02‾98

2915488    63.00

981255125

EXHIBIT A ORIGINAL COMPLAINT

AUG-27-98 11:50   From:PORTER & HEDGES LLP                                    T-340  P.03/10  Job-977
JUN-30 9S  10:25  From:FORTER I MEP6t, 4Lr

*CER TFICA*    OF **LIMITED PARTITERSHIP**

*OF*

*ROYCE HOMES, LP.*

.h is **Certificate of Limited Partnership of Royce** *Homes, L.P. (the " d*[8]e     hip')* i **being duly executed and filed by Hammersmith amp. lne., a Delaware corpor   a,, as general partner, to form a limited partnership under the Delaware Revised Uniform Limited P   e:ship Act.**

    *1.*   *Name. The Name* **ate** lieriited **perm-ship formed hereby is Royce** *Homes, L.P.*

    **3.**   Registered Dice. The registered office of the P     ership is 1209 **Orange Street, Wilmington, Delaware !I ᵍo'.**

    **3.**   Registered Agent. The name sad address of the registered **agent for** *service of process on the* P     trip **is The Corporation Trust Company, 1209** *Orange* Stream Wilmington, Delaware 19801.

    **4.**   General Partner.   **The name, the mailing address. and the street address of the business of the general pier of the Partnership is:**

> *Hammersmith Croup. Inc.*
> **14614 Falling Creek. Suite 250**
> **Houston, Taxes 77068**

V IAMNESS WHEIMF, this Certificate of Limited Partnurship has been executed **this**      day of June, 199B.

**GENERAL PA R R**

H     RSMITH **CROUP, INC,**

By:

J     S   r,

**President, Secretary and Treasurer**

BR    F    S    i    8L9      4



Corporations Section
P.O. Box 13697
Austin, Texas 78711-3697

Gwyn Shea
Secretary of State

## Office of the Secretary of State

### Packing Slip

**July 9, 2002**

Page 1 of 1

rovicebuilders.com
7850 North Sam Houston Parkway West
Houston, TX 77064

**Batch Number:** 1288987
**Client ID:** 33628719

**Batch Date:** 06-14-2002
**Return Method:** Mail

| Document Number | Document Detail | Filing Number / Name | Page Count | Fee |
|---|---|---|---|---|
| 12889870002 | Change of Registered Agent/ Office | ROYCE HOMES, LTD. | 0 | $50.00 |
| | | **Total Document Fees** | | **$50.00** |

| Payment Type | Payment Status | Payment Reference | Amount |
|---|---|---|---|
| Check | Received | 58952 | $50.00 |
| | | **Total Payments Received** | **$50.00** |
| | | **Total Amount Charged to Client Account** | $0.00 |
| | | **Total Amount Credited to Client Account** | $0.00 |

*Note:* Any amount due need not be paid until the monthly statement is received.
Any amount credited to Client Account may be refunded upon request.
Refunds (if applicable) will be processed within 10 business days.
Acknowledgement of Filing Document(s) (if present) is attached.

User ID: LBOOTS

*Come visit us on the Internet @ http://www.sos.state.tx.us/*

8/13/2010
(512) 463-5555
AMEGY007389
Amegy Bank Production
FAX (512) 463-5709
0074087
TTY 7-1-1
EXHIBIT A ORIGINAL COMPLAINT

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

TE 0



Gwyn Shea
Secretary of State

# Office of the Secretary of State

July 09, 2002

roycebuilders.com
7850 North Sam Houston Parkway West
Houston, TX 77064 USA

RE: ROYCE HOMES, LTD.
File Number: 11046111

It has been our pleasure to file the change of registered agent or registered office, or both for the referenced entity. This letter maybe used as evidence of the filing and payment of the filing fee.

If we may be of further service at any time, please let us know.

Sincerely,

Corporations Section
Statutory Filings Division
(512) 463-5555

Enclosure

8/13/2002 (512) 463-5555     FAX(512) 463-5709     TTY7-1-1   0074088
Prepared by: Linda Boots
**AMEGY007390**                Amegy Bank Production

EXHIBIT A ORIGINAL COMPLAINT

Corporations Section
P.O. Box 13697
Austin, Texas 78711-3697



Gwyn Shea
Secretary of State

# Office of the Secretary of State

## CERTIFICATE OF FILING
### OF

### ROYCE HOMES, LTD.
Filing Number: 11046111

The undersigned, as Secretary of State of Texas, hereby certifies that the statement of change of registered agent/office for the above named entity has been received in this office and has been found to conform to law.

ACCORDINGLY the undersigned, as Secretary of State, and by virtue of the authority vested in the Secretary by law hereby issues this Certificate of Filing.

Dated: 06/14/2002

Effective: 06/14/2002



Gwyn Shea
Secretary of State

8/13/2010 903-5555
Prepared by: Linda Boots
AMEGY007391

Amegy Bank Production

TT0074089

EXHIBIT A ORIGINAL COMPLAINT

Corporations Section
P.O. Box 13697
Austin, Texas 78711-3697



Alberto R. Gonzales
Secretary of State

## Office of the Secretary of State

July 9, 1998

**John M Ransom**
**Porter & Hedges LLP**
**700 Louisiana**
**Houston, Tx. 77002-2764**

**RE: ROYCE HOMES, L.P.**
**FILE NUMBER: 110461-11**

The following instrument has been filed in this office:

Application for Registration As a Foreign Limited Partnership

If **you** enclosed an extra copy of the instrument with your submission we are returning a file stamped copy for your records. Receipt of your remittance in payment of the filing fee is acknowledged by this letter.  Should you,**require further information or** assistance, **please call (512) 463-5583.**

Sincerely yours,

1,ori(a. U,..)ovy;-h4

Lorna Wassdorf
**Deputy Assistant Secretary**
Statutory Filings Division

(512) 463-5555                    FAX (512) 463-5709                  TDD (800) 735-2989
The Office of the Secretary of State does not discriminate on the basis of race, color, national origin, religion, age or disability in employment or the provision of services.

8/13/2010                              Amegy Bank Production                              A074090

AMEGY007392                                                EXHIBIT A ORIGINAL COMPLAINT

**APPLICATION FOR REGISTRATION** AS
**FOREIGN LIMITED PARTNERSHIP**

FILED
In the Office of the
*ecretaryof State of Texas

JUL 8  1998

**Corporations Section**

Pursuant to the provisions of Section 9.02 of the Texas Revised Limited Partnership Act (the "Act"), the undersigned limited partnership hereby applies for a certificate of authority to transact business in Texas:

1.      The name of the limited partnership is   Royce Homes, LP.

2.      (A) If the name of the foreign partnership does not contain the words "Limited Partnership", "Limited" or the abbreviation "L.P." or "Ltd." as the last words or letters of its name, then the name of the limited partnership with the words or abbreviation which it elects to add for use in Texas is:

_____

        (B) If its name is not available in Texas, then the name which the limited partnership elects to use in Texas is:_____

_____

_____

3.      It was formed under the laws of Delaware on June 30, 1998.

4.      As of the date of this filing, the foreign limited partnership validly exists as a limited partnership under the laws of the jurisdiction of its formation.

5.      The nature of the business or purposes to be conducted or promoted in Texas are as follows: any and all lawful business for which limited partnerships may be organized under the Texas Revised Limited Partnership Act, as amended from time to time, and further to do such things as may be incident to, and necessary or appropriate to effect, any and all such purposes.

6.      The street or building address of its proposed registered office in Texas is: 14614 Falling Creek, Suite 250, Houston, Texas 77068 and the name of its proposed registered agent at such address for service of process pursuant to Section 1.06 of the Act is John Speer.

7.      The limited partnership hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in Section 9.10(b) of the Act.

::ODMA PCDOCS D005119867811

8.    The name, the mailing address; and the street address of the business or residence of each general partner is as follows:

| Name | Mailing Address (include city, state, zip code) | Street Address (include city, state, zip code) |
|------|------------------------------------------------|-----------------------------------------------|
| Hammersmith Group, Inc. | 14614 Falling Creek, Suite 250 Houston, Texas 77068 | Same |

9.    The date on which the foreign limited partnership first transacted, or intends to transact, business in Texas is as soon as registered with the Texas Secretary of State..

HAMMERSMITH GROUP, INC.,
a Delaware corporation.
General Partner

By _____ Pres.
John Spec, President

::ODMA\PCDOC,SIDOCS\19867811

EXHIBIT A ORIGINAL COMPLAINT

Exhibit "B"

First Amended and Restated Agreement of Limited Partnership of Royce Homes, L.P.

8/13/2010              Amegy Bank Production              0074093
**AMEGY007395**
                                      EXHIBIT A ORIGINAL COMPLAINT

# FIRST AMENDED AND RESTATED AGREEMENT

### OF

# LIMITED PARTNERSHIP

### OF

# ROYCE HOMES, L.P.

8/13/2010          Amegy Bank Production          0074094

AMEGY007396

EXHIBIT A ORIGINAL COMPLAINT

# TABLE OF CONTENTS

Page No.

ARTICLE 1
DEFINITIONS
1.1     Defined Terms .................................................. 1
      (a)    "*Act*" .................................................. 1
      (b)    "*Adjusted Capital Account Deficit*" .......................... 1
      (c)    "*Affiliate*" .................................................. 1
      (d)    "*Agreement*" .................................................. 2
      (e)    "*Allocation Year*" .......................................... 2
      (f)    "*Available Cash*" ............................................ 2
      (g)    "*Capital Account*" .......................................... 2
      (h)    "*Capital Contribution*" ...................................... 3
      (i)    "*Code*" .................................................. 3
      (j)    "*Debt Distribution Amount*" .................................. 3
      (k)    "*Debt Distribution Payout*" .................................. 3
      (l)    "*Default Interest Rate*" ...................................... 3
      (m)    "*Depreciation*" ............................................ 4
      (o)    "*Effective Date*" ............................................ 4
      (p)    "*General Partner*" .......................................... 4
      (q)    "*Gross Asset Value*" ........................................ 4
      (r)    "*House Start*" .............................................. 5
      (s)    "*Hypothetical Tax Amount*" .................................. 5
      (t)    "*Initial Capital Contribution*" ................................ 5
      (u)    "*Interest*" .................................................. 5
      (v)    "*Lender*" .................................................. 5
      (w)    "*Limited Partner*" .......................................... 5
      (x)    "*Liquidator*" .............................................. 5
      (y)    "*Nonrecourse Deductions*" .................................. 5
      (z)    "*Nonrecourse Liability*" ...................................... 6
      (aa)    "*Partner Nonrecourse Debt*" ................................ 6
      (bb)    "*Partner Nonrecourse Debt Minimum Gain*" ................... 6
      (cc)    "*Partner Nonrecourse Deductions*" .......................... 6
      (dd)    "*Partners*" ................................................ 6
      (ee)    "*Partnership*" .............................................. 6
      (ff)    "*Partnership Interest*" ...................................... 6
      (gg)    "*Partnership Property*" ...................................... 6
      (hh)    "*Person*" .................................................. 6
      (ii)    "*Profits*" and "*Losses*" .................................... 6
      (jj)    "*Regulatory Allocations*" .................................... 7
      (kk)    "*Required Interest*" ........................................ 7
      (ll)    "*Senior Debt*" .............................................. 7
      (mm)    "*Substitute Limited Partner*" ................................ 8
      (nn)    "*UCC*" .................................................. 8
1.2     Section Headings, Gender .................................... 8

8/13/2010       Amegy Bank Production       0074095
AMEGY007397

EXHIBIT A ORIGINAL COMPLAINT

## TABLE OF CONTENTS
### (Continued)

Page No.

ARTICLE 2
    ORGANIZATION
    2.1    Formation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    2.2    Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    2.3    Registered Agent and Registered Office . . . . . . . . . . . . . . . . . . 8
    2.4    Location of Principal Place of Business . . . . . . . . . . . . . . . . . . . . 8
    2.5    Business and Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    2.6    Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    2.7    Filing of Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    2.8    Partnership Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    2.9    Organization Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    2.10   Power of Attorney. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE 3
    CAPITALIZATION AND ADDITIONAL FINANCING
    3.1    Commencement of Operations . . . . . . . . . . . . . . . . . . . . . . . . 10
    3.2    Limited Partners' Initial Capital Contributions . . . . . . . . . . . . 10
    3.3    Contributions of General Partner . . . . . . . . . . . . . . . . . . . . . . . 10
    3.4    Partnership Borrowing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    3.5    Additional Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    3.6    Revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    3.7    Partnership Capital. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    3.8    Capital Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE 4
    ALLOCATIONS AND DISTRIBUTIONS
    4.1    Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    4.2    Special Federal Income Tax Allocations . . . . . . . . . . . . . . . . . 13
         (a)   *Minimum Gain Chargeback* . . . . . . . . . . . . . . . . . . . . . 13
         (b)   *Partner Minimum Gain Chargeback* . . . . . . . . . . . . . . 13
         (c)   *Qualified Income Offset* . . . . . . . . . . . . . . . . . . . . . . 13
         (d)   *Gross Income Allocation* . . . . . . . . . . . . . . . . . . . . . 13
         (e)   *Nonrecourse Deductions* . . . . . . . . . . . . . . . . . . . . . 14
         (f)    *Partner Nonrecourse Deductions* . . . . . . . . . . . . . . . 14
         (g)   *Section 754 Adjustments* . . . . . . . . . . . . . . . . . . . . . 14
         (h)   *Priority Allocation* . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    4.3    Curative Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    4.4    Loss Limitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    4.5    Other Allocation Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    4.6    Tax Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    4.7    Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    4.8    Tax Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

8/13/2010           Amegy Bank Production         0074096
AMEGY007398
                           EXHIBIT A ORIGINAL COMPLAINT

**TABLE OF CONTENTS**
(Continued)

| | | Page No. |
|---|---|---|
| 4.9 | Offset of Distributions | 16 |
| 4.10 | Fee to Royce Homes, Inc. | 16 |

ARTICLE 5
RIGHTS AND DUTIES OF THE GENERAL PARTNER

| | | |
|---|---|---|
| 5.1 | Management | 17 |
| 5.2 | Reliance by Public. | 18 |
| 5.3 | Liabilities; Indemnification. | 19 |
| 5.4 | Title to Partnership Properties | 19 |
| 5.5 | Transfer of Interest of General Partner. | 20 |
| 5.6 | Removal of General Partner | 20 |
| 5.6 | Compensation. | 20 |

ARTICLE 6
RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

| | | |
|---|---|---|
| 6.1 | Limitation of Liability | 20 |
| 6.2 | Management of Business | 20 |
| 6.3 | Outside Activities | 20 |
| 6.4 | Withdrawal. | 20 |
| 6.5 | Assignee's Rights | 20 |
| 6.6 | No Liability of General Partner for Distributions | 21 |
| 6.7 | Substitute Limited Partner. | 21 |
| 6.8 | Indemnification and Terms of Admission | 22 |
| 6.9 | Death or Incapacity of Limited Partner | 22 |
| 6.10 | No Dissolution Caused | 22 |

ARTICLE 7
ADMISSION OF ADDITIONAL GENERAL PARTNERS

| | | |
|---|---|---|
| 7.1 | Admission of Additional General Partner | 22 |

ARTICLE 8
FISCAL YEAR; BOOKS OF ACCOUNT;
BANK ACCOUNTS; AND REPORTS

| | | |
|---|---|---|
| 8.1 | Books and Records | 23 |
| 8.2 | Bank Accounts | 23 |
| 8.3 | Tax Elections. | 23 |
| 8.4 | Tax Reporting Information | 24 |
| 8.5 | Reporting Expenses | 24 |

ARTICLE 9
DISSOLUTION, WINDING UP AND TERMINATION; CONTINUATION

| | | |
|---|---|---|
| 9.1 | Events of Dissolution. | 24 |

8/13/2010        Amegy Bank Production                0074097
**AMEGY007399**
                                          EXHIBIT A ORIGINAL COMPLAINT

# TABLE OF CONTENTS
## (Continued)

Page No.

| | | |
|---|---|---|
| 9.2 | Continuation of Business. | 25 |
| 9.3 | Agreement of Successor General Partner | 26 |
| 9.4 | Liquidation | 26 |
| 9.5 | Distributions in Kind | 26 |

ARTICLE 10

AMENDMENT OF PARTNERSHIP AGREEMENT

| | | |
|---|---|---|
| 10.1 | Amendments to be Adopted Solely by General Partner | 27 |
| 10.2 | Amendments to be Adopted with Consent of Limited Partners | 27 |
| 10.3 | Consent of General Partner Required | 28 |

ARTICLE 11

RESTRICTIONS ON DISPOSITION OF PARTNERSHIP INTEREST

| | | |
|---|---|---|
| 11.1 | Death, Insanity or Bankruptcy of a Partner | 28 |
| 11.2 | Price and Terms. | 29 |
| 11.3 | Voluntary Buy-Sell | 30 |
| 11.4 | Rights to Compel Sale. | 31 |
| 11.5 | Tag-Along Rights. | 32 |
| 11.6 | Right of First Offer. | 34 |

ARTICLE 12

MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| 12.1 | Notices | 35 |
| 12.2 | Execution and Counterparts | 35 |
| 12.3 | Waiver of Partition | 35 |
| 12.4 | Governing Law, Successors, Severability | 35 |
| 12.5 | Integrated Agreement | 35 |
| 12.6 | No Waiver | 36 |
| 12.7 | Legends | 36 |
| 12.8 | Presumptions | 36 |
| 12.9 | Time of Essence | 36 |

8/13/2010          Amegy Bank Production          0074098
AMEGY007400
                                    EXHIBIT A ORIGINAL COMPLAINT

# FIRST AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP
### OF
### ROYCE HOMES, L.P.

THIS FIRST AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (the "Restated Agreement") is made and entered into as of July 1, 1998, by and among Hammersmith Group, Inc., a Delaware corporation (the "General Partner"), Royce Homes, Inc., a Texas corporation, and First Duvall Group, Inc., a Nevada corporation (the "Limited Partners"). This Restated Agreement constitutes a full and complete replacement of the Agreement of Limited Partnership of Royce Homes, L.P. as of June 30, 1998 (the "Original Agreement").

## ARTICLE 1
### DEFINITIONS

1.1    **Defined Terms.**  As used in this Agreement, the following terms shall have the meanings set forth below:

(a)    "*Act*" shall mean the Delaware Revised Uniform Limited Partnership Act; Del. Code Ann. Title 6 §§ 17-101 to 17-1111, as from time to time amended.

(b)    "*Adjusted Capital Account Deficit*" means, with respect to any Partner, means the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Allocation Year, after giving effect to the following adjustments:

(i)    Credit to such Capital Account any amounts which such Partner is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and

(ii)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)    "*Affiliate*" means (i) any person directly or indirectly owning, controlling or holding with power to vote 10% or more of the outstanding voting securities of the General Partner; (ii) any person 10% or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by the General Partner; (iii) any person directly or indirectly controlling, controlled by or under common control with the General Partner; (iv) any officer, director, or partner (other than a limited partner in a partnership managed by the General Partner) of the General Partner; and (v) any partnership or joint venture in which the General Partner is a partner or joint venturer.

(d)     "*Agreement*" shall mean this Agreement of Limited Partnership as originally executed and as amended, modified, supplemented or restated from time to time.

(e)     "*Allocation Year*" means (i) the period commencing on the Effective Date and ending on December 31, 1998, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31 or (iii) any portion of the period described in clauses (i) or (ii) for which the Partnership is required to allocate Profits, Losses and other items of Partnership income, gain, loss or deduction pursuant to Article 4 hereof.

(f)     "*Available Cash*" means all cash funds of the Partnership on hand from time to time (other than cash funds obtained as contributions to the capital of the Partnership by the Partners and cash funds obtained from loans to the Partnership) after (i) payment of all operating expenses of the Partnership as of such time, and (ii) provision for a working capital reserve in an amount to be determined by the General Partner, including amounts required to ensure full compliance with the terms of all loan covenants and agreements of the Partnership.

(g)     "*Capital Account*" means, with respect to any Partner, the Capital Account maintained for such Partner in accordance with the following provisions:

(i)   To each Partner's Capital Account there shall be credited (A) such Partner's Capital Contributions, (B) that Partner's share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Section 4.2 and Section 4.3, and (C) the amount of any Partnership liabilities assumed by such Partner or which are secured by any Property distributed to such Partner. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Partnership by the maker of the note (or a Partner related to the maker of the note within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(c)) shall not be included in the Capital Account of any Partner until the Partnership makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(d)(2);

(ii)  To each Partner's Capital Account there shall be debited (A) the amount of money and the Gross Asset Value of any Property distributed to such Partner pursuant to any provision of this Agreement, (B) such Partner's share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section 4.2 or Section 4.3 hereof, and (C) the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any Property contributed by such Partner to the Partnership;

(iii) In the event a Partnership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Partnership Interest; and

8/13/2010          Amegy Bank Production          0074100
AMEGY007402
                              EXHIBIT A ORIGINAL COMPLAINT

(iv) In determining the amount of any liability for purposes of subparagraphs (i) and (ii) above, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Treasury Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Partnership or any Partners, are computed in order to comply with such Treasury Regulations, the General Partner may make such modification, provided that it is not likely to have a material effect on the amounts distributed to any Person pursuant to Article 10 hereof upon the dissolution of the Partnership. The General Partner also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Partners and the amount of capital reflected on the Partnership's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(q), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

(h)  **"Capital Contribution"** means the total amount of money and/or the initial Gross Asset Value of any property (net of any liabilities assumed or taken subject to) that is actually contributed to the Partnership by all of the Partners or any class of Partners or any one Partner, as the context requires. A Limited Partner's Capital Contribution includes the cash price paid to the Partnership and the initial Gross Asset Value of property contributed (net of any liabilities assumed or taken subject to) for the Partnership Interest by the Limited Partner plus the amount of any Mandatory Assessments actually made by the Limited Partner.

(i)  **"Code"** means the Internal Revenue Code of 1986, as amended, or any successor statute thereto.

(j)  **"Debt Distribution Amount"** shall mean an aggregate amount equal to ten million dollars ($10,000,000) to be distributed to the Partners in proportion to their Partnership Interests in equal monthly installments over a five-year period commencing on September 1, 1998.

(k)  **"Debt Distribution Payout"** shall mean the time upon which the aggregate Debt Distribution Amount has been made.

(l)  **"Default Interest Rate"** means a rate per annum equal to Thirteen Percent (13%).

(m)  **"Depreciation"** means, for each Allocation Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Allocation Year, except that if the Gross Asset Value of an asset differs from

8/13/2010          Amegy Bank Production          0074101
AMEGY007403
                                              EXHIBIT A ORIGINAL COMPLAINT

its adjusted basis for federal income tax purposes at the beginning of such Allocation Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Allocation Year bears to such beginning adjusted tax basis; *provided, however,* that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Allocation Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

(n)     *"Developed Residential Lot"* means a platted residential lot that abuts a paved street, and to which all utilities necessary for the construction of a single family residential dwelling are available at the curb of such street.

(o)     *"Effective Date"* shall mean July 1, 1998.

(p)     *"General Partner"* means Hammersmith Group, Inc.  The term "General Partner" also includes any other person who is duly admitted to the Partnership as an additional or substitute general partner.

(q)     *"Gross Asset Value"* means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)  The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the General Partner;

(ii)  The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account, as determined by the General Partner as of the following times: (A) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property as consideration for an interest in the Partnership; and (C) the liquidation of the Partnership within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), *provided* that an adjustment described in clauses (A) and (B) of this paragraph shall be made only if the General Partner reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Partners in the Partnership;

(iii)  The Gross Asset Value of any item of Partnership assets distributed to any Partner shall be adjusted to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset on the date of distribution as determined by the General Partner; and

(iv)  The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Sections 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations

8/13/2010          Amegy Bank Production          0074102
AMEGY007404
EXHIBIT A ORIGINAL COMPLAINT

Section 1.704-1(b)(2)(iv)(m) and subparagraph (vi) of the definition of "Profits" and "Losses" or Section 4.2(c) hereof; *provided, however*, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (ii) or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Profits and Losses.

(r)   *"House Start"* shall mean the earlier of (i) the issuance of a construction start memorandum or (ii) draw on a loan for construction of a residence on a lot paid directly by the title company to Royce Homes, Inc.

(s)   *"Hypothetical Tax Amount"* shall mean with respect to any Partner, an amount equal to the product of (i) the combined maximum prevailing federal and any Texas State and local income tax rate, if applicable, for individuals, together with any Texas franchise tax imposed on a partner (taking into account the deductibility of state and local taxes), and (ii) the amount of Partnership Profits and Losses allocated for tax purposes to such Partner pursuant to this Agreement for each allocation period.

(t)   *"Initial Capital Contribution"* means the amount in cash or other assets to be contributed to the capital of the Partnership pursuant to Articles 2 and 3 by all the Partners, the Limited Partners, the General Partner, or any one Partner, as the context requires.

(u)   *"Interest"* means the entire ownership interest of a Partner in the Partnership at any particular time as a General Partner or a Limited Partner, including, but not limited to, the right of such Partner to any and all rights and benefits to which a Partner is entitled pursuant to the terms of this Agreement.

(v)   *"Lender"* means any Person or any successor, replacement or assignee or other Person who loans money to the Partnership.

(w)   *"Limited Partner"* means any person who is admitted to the Partnership as a limited partner or any class of limited partner pursuant to the terms of this Agreement.

(x)   *"Liquidator"* shall have the meaning set forth in Section 9.4.

(y)   *"Nonrecourse Deductions"* has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

(z)   *"Nonrecourse Liability"* has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

8/13/2010                    Amegy Bank Production                    0074103
AMEGY007405
                                                    EXHIBIT A ORIGINAL COMPLAINT

(aa)    *"Partner Nonrecourse Debt"* has the same meaning as the term "partner nonrecourse debt" in Section 1.704‑2(b)(4) of the Treasury Regulations.

(bb)    *"Partner Nonrecourse Debt Minimum Gain"* means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse.

(cc)    *"Partner Nonrecourse Deductions"* has the same meaning as the term "partner nonrecourse deductions" in Sections 1.704‑2(i)(1) and 1.704‑2(i)(2) of the Treasury Regulations.

(dd)    *"Partners"* means both the General Partner and the Limited Partners who are admitted as partners in the Partnership, unless otherwise indicated.

(ee)    *"Partnership"* means Royce Homes, L.P., a Delaware limited partnership, as the Partnership may be constituted from time to time.

(ff)    *"Partnership Interest"* means the entire ownership interests and rights of a Partner, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve, which for voting rights and other purposes shall be in the percentages set forth on the signature page hereto.

(gg)    *"Partnership Property"* means all interests, properties and rights of any type, whether real, personal, tangible or intangible, owned by the Partnership.

(hh)    *"Person"* shall mean a natural person, partnership (whether general or limited and whether domestic or foreign), trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

(ii)    *"Profits"* and *"Losses"* mean, for each Allocation Year, an amount equal to the Partnership's taxable income or loss for such Allocation Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(i)    Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(ii)    Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704‑1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(iii)    In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of Gross Asset Value, the

8/13/2010          Amegy Bank Production          0074104
AMEGY007406
                                        EXHIBIT A ORIGINAL COMPLAINT

amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(iv)  Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(v)  In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Year, computed in accordance with the definition of Depreciation;

(vi)  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulations Section 1.704–(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Partner's interest in the Partnership, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii)  Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.2 or Section 4.3 hereof shall not be taken into account in computing Profits or Losses.

The amounts of the items of Partnership income, gain, loss or deduction available to be specially allocated pursuant to Sections 4.2 and 4.3 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) above.

(jj)  **"*Regulatory Allocations*"** has the meaning set forth in Section 4.3 hereof.

(kk)  **"*Required Interest*"** means those Partners holding greater than 50% of the aggregate Partnership Interests.

(ll)  **"*Senior Debt*"** means the principal of and premium, if any, and interest on all indebtedness of the Partnership to a Lender whether outstanding on the date hereof or thereafter created, that is secured by liens on substantially all of the Partnership's assets and any refinancing of such indebtedness with any Person, unless by the terms of the instrument creating or evidencing any of the indebtedness referred to above, it is expressly provided that such indebtedness is not superior in right of payment to any subordinated debt.

(mm)  **"*Substitute Limited Partner*"** shall mean any Person admitted to the Partnership as a Limited Partner pursuant to the provisions of Section 6.7.

8/13/2010          Amegy Bank Production          0074105
AMEGY007407
                                        EXHIBIT A ORIGINAL COMPLAINT

(nn)   *"UCC"* means the Uniform Commercial Code of the State of Delaware, as from time to time amended.

**1.2   Section Headings, Gender.** The headings in this Agreement are inserted for convenience of reference only and shall not affect interpretation of this Agreement. Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine or the neuter gender shall include the masculine, the feminine and the neuter. The terms "hereof," "herein" or "hereunder" shall refer to this Agreement as a whole and not to any particular Article or Section.

# ARTICLE 2
## ORGANIZATION

**2.1   Formation.** The Partnership has been formed as a limited partnership under the Act. The rights, duties and liabilities of the Partners shall be as provided in the Act, except as otherwise provided herein.

**2.2   Name.** The name of the Partnership shall be "Royce Homes, L.P." or such other name or names as the General Partner may from time to time deem necessary, appropriate or advisable.

**2.3   Registered Agent and Registered Office.** The initial registered agent of the Partnership in the State of Delaware shall be The Corporation Trust Company and the initial registered office of the Partnership shall be located at 1209 Orange Street, Wilmington, Delaware 19801. The General Partner may from time to time change the registered agent or registered office of the Partnership, or both. The General Partner shall promptly notify all other Partners of any change in the registered office or registered agent of the Partnership.

**2.4   Location of Principal Place of Business.** The principal place of business of the Partnership shall be 14614 Falling Creek, Suite 250, Houston, Texas 77068. The Partnership may maintain such other offices at such other places as the General Partner deems advisable.

**2.5   Business and Purpose.** The business and purpose of the Partnership shall be the transaction of any and all lawful business for which partnerships may be formed under the Act. The business and purpose of the Partnership shall encompass additionally any activities contemplated by the rights and powers of the General Partner described in this Agreement to the extent not specifically set forth in this Section.

**2.6   Term.** The term of the Partnership shall be perpetual.

**2.7   Filing of Certificates.** The General Partner shall execute, file and publish all such certificates, notices, statements or other instruments required by law for the formation or operation of a limited partnership in all jurisdictions where the Partnership may propose to do business. The General Partner may amend the Certificate from time to time for any proper purpose.

8/13/2010          Amegy Bank Production          0074106
AMEGY007408

EXHIBIT A ORIGINAL COMPLAINT

**2.8    Partnership Interests.**

(a)    The General Partner accepted Capital Contributions from Royce Homes, Inc. as specified in Exhibit A of the Original Agreement in exchange for an aggregate interest in the Partnership of ninety-nine and nine tenths percent (99.9%).

(b)    Hammersmith Group, Inc. is the sole General Partner and made an Initial Capital Contribution as set forth in Section 3.3. The General Partner received in exchange for such Initial Capital Contribution one tenth of one percent (0.1%), and subsequently purchased a partnership interest from Royce Homes, Inc. on the Effective date such that it now holds a one percent (1%) general partnership interest in the Partnership.

(c)    First Duvall Group, Inc. purchased a forty nine percent (49%) limited partnership interest in the Partnership from Royce Homes, Inc. on the Effective Date.

**2.9    Organization Certificates.** Upon the request of the General Partner, each Limited Partner agrees to execute and deliver from time to time all certificates and other documents deemed necessary by the General Partner to accomplish all filing, recording, publishing, and other acts appropriate to comply with all requirements (a) for the formation and operation of a limited partnership under the Act, and (b) for the formation, qualification, and operation of a limited partnership, or a partnership in which the limited partners have limited liability, in all other jurisdictions where the Partnership shall propose to conduct business.

**2.10    Power of Attorney.** Each Limited Partner hereby irrevocably designates and appoints Hammersmith Group, Inc. the General Partner of the Partnership, and its successors and assigns, each with full power of substitution, his agent and attorney-in-fact in his name, place and stead (i) to do any acts necessary to qualify the Partnership to do business under the laws of any jurisdiction in which it is necessary or advisable to file any instrument in writing in connection with such qualification, and (ii) to consent to, make, execute, swear to and acknowledge, amend, file, record, deliver and publish: (1) any certificate of limited partnership or amended certificate of limited partnership under the Act, and any other certificates, either original or amended, required or permitted to be filed or recorded under statutes relating to limited partnerships under the laws of any jurisdiction in which the Partnership shall engage or seek to engage in business; (2) a counterpart of or amendment to this Agreement for the purpose of substituting as a Limited Partner an assignee or successor to all or any portion of a Limited Partner's Interest pursuant to this Agreement; (3) a counterpart of this Agreement or of any amendment hereto for the purpose of filing or recording such counterpart in any jurisdiction in which the Partnership may own property or transact business; (4) all certificates and other instruments necessary to qualify or continue the Partnership as a limited partnership or partnership wherein the Limited Partners have limited liability in any jurisdiction where the Partnership may own property or be doing business; (5) any fictitious or assumed name certificate required or permitted to be filed by or on behalf of the Partnership; (6) any other instrument which is now or which may hereafter be required by law to be filed for or on behalf of the Partnership or its Partners with respect to Partnership business; (7) certificates or other instruments evidencing the dissolution or termination of the Partnership when such shall be appropriate in each jurisdiction in which the Partnership shall own property or do business; (8) any amendment to this Agreement adopted pursuant to the applicable provisions of this Agreement; and (9) a counterpart of, or amendment to this Agreement for the purpose of admitting or removing a

8/13/2010          Amegy Bank Production          0074107
**AMEGY007409**

EXHIBIT A ORIGINAL COMPLAINT

Person as a Partner pursuant to this Agreement (including, but not limited to, the provisions of Section 6.4 hereof).

## ARTICLE 3
### CAPITALIZATION AND ADDITIONAL FINANCING

**3.1　Commencement of Operations.** The Partnership shall not commence operations unless contributions for an aggregate interest in the Partnership of one hundred percent (100%) have been received and accepted by the General Partner on behalf of the Partnership.

**3.2　Limited Partners' Initial Capital Contributions.** The Initial Capital Contribution of the Limited Partners is as set forth on Exhibit A to the Original Agreement.

**3.3　Contributions of General Partner.** The General Partner contributed to the capital of the Partnership (a) as its Initial Capital Contribution the sum of One Thousand Dollars ($1,000) and (b) shall contribute such additional amounts in cash or property as may from time to time be necessary to pay costs allocated to it pursuant to this Agreement.

**3.4　Partnership Borrowing.**

(a)　The General Partner may cause the Partnership to borrow money from time to time, from third parties or from the General Partner, and may mortgage or pledge Partnership Property to obtain and secure the repayment of such loans. The proceeds of Partnership loans may be used for any Partnership purpose, including, but not limited to, the payment of the costs related to partnership expenses or to refinance Partnership indebtedness.

(b)　The General Partner may cause the Partnership to borrow from third parties or the General Partner. The General Partner is not, however, obligated to lend funds to the Partnership. If the General Partner loans money to the Partnership, it will receive interest at the lesser of (i) two (2) percentage points over the fluctuating per annum rate of interest reported in the *Wall Street Journal* as the "Prime Rate" or (ii) the maximum lawful rate that may be charged under applicable state or federal law. The General Partner may secure loans by it to the Partnership by mortgages or pledges of Partnership Property. Loans by the General Partner to the Partnership shall be treated as indebtedness to a non-Partner lender and will be payable prior to any distributions to the Limited Partners.

**3.5　Additional Financing.** No Limited Partner shall be required to make any contribution to the capital of the Partnership other than (a) his Initial Capital Contribution pursuant to Sections 2.8 or 3.2, and (b) any amounts required to be paid to or for the benefit of the Partnership pursuant to Section 6.1. This provision shall not be deemed a limitation, however, on the General Partner's right to cause the Partnership to borrow or to retain, use or pledge so much of the undistributed revenues and other assets of the Partnership as in its opinion may be required to provide for the Partnership's anticipated future cash needs (including contingencies), or to repay amounts borrowed.

**3.6　Revenues.** Any or all revenues received by the Partnership may be accumulated and retained in the Partnership for any Partnership purpose including, but not limited to, the costs of

8/13/2010　　　　　　Amegy Bank Production　　　　　　0074108
**AMEGY007410**
EXHIBIT A ORIGINAL COMPLAINT

partnership expenses or the repayment of borrowing by the Partnership. The extent to which the Partnership accumulates or expends its revenues will be determined in the sole discretion of the General Partner.

3.7     **Partnership Capital.**

(a)     No interest shall be paid by the Partnership on any Capital Contributions to the Partnership or on Capital Account balances.

(b)     No Partner shall have the right to withdraw any part of his Capital Contribution to the Partnership or his Capital Account, or to receive any return of any portion of his Capital Contribution or his Capital Account, except as may be specifically provided in this Agreement.

(c)     Under circumstances involving a return of any Capital Contribution, no Partner shall have the right to receive property other than cash, except as may be specifically provided in this Agreement.

(d)     Loans from a Partner to the Partnership shall not be considered Capital Contributions.

3.8     **Capital Accounts.** Each Partner shall have a capital account with a balance maintained in accordance with the definition of *"Capital Account"* in Section 1.1(h) hereof.

## ARTICLE 4
### ALLOCATIONS AND DISTRIBUTIONS

4.1     **Allocations.** Except as otherwise provided in this Agreement, all cash and expenses (other than cash or property distributed in connection with the dissolution and liquidation of the Partnership) and all revenues and expenses shall be allocated and distributed among the Partners as follows:

(a)     *Profits*. After giving effect to the special allocations set forth in Sections 4.2 and 4.3 hereof, Profits for any Allocation Year shall be allocated as follows:

(i)     First, 100% to the General Partner in an amount equal to the excess, if any, of (i) the cumulative losses allocated to the General Partner pursuant to Section 4.1(b)(ii) hereof for all prior Allocation Years, over (ii) the cumulative Profits allocated to the General Partner pursuant to this Section 4.1(a) for all prior Allocation Years;

(ii)     Second, 1% to the General Partner and 99% to the Limited Partners in an amount equal to the excess, if any, of (i) the cumulative losses allocated to the Partners pursuant to Section 4.1(b)(i) hereof for all prior Allocation Years, over (ii) the cumulative Profits allocated to the Partners pursuant to this Section 4.1(a)(ii) for all prior Allocation Years; and

8/13/2010          Amegy Bank Production          0074109
**AMEGY007411**
                                        EXHIBIT A ORIGINAL COMPLAINT

(iii)     Third, until Debt Distribution Payout, a monthly amount equal to zero point eight and one third percent (.8333333%) of the remaining Debt Distribution Amount, determined as of the end of each calendar month, to the Partners in accordance with their Partnership Interests; and

(iv)     The balance, if any, to the Partners in accordance with their Partnership Interests.

(v)     Notwithstanding the foregoing, for the calendar months of July 1998 through December 1998, the following special allocations of profit shall be made:

(1)     For July 1998, 100% to Royce Homes, Inc.;

(2)     For August 1998, 75% to Royce Homes, Inc. and 25% to First Duvall Group, Inc.;

(3)     For September 1998, 75% to Royce Homes, Inc. and 25% to First Duvall Group, Inc.;

(4)     For October 1998, 62.5% to Royce Homes, Inc. and 37.5% to First Duvall Group, Inc.;

(5)     For November 1998, 62.5% to Royce Homes, Inc. and 37.5% to First Duvall Group, Inc.; and

(6)     For December 1998, 62.5% to Royce Homes, Inc. and 37.5% to First Duvall Group, Inc.

(b)     *Losses*.  After giving effect to the Special Allocations set forth in Sections 4.2 and 4.3 hereof, Losses for any Allocation Year shall be allocated as follows:

(i)     First, among the Partners in accordance with their Partnership Interests, provided that Losses shall not be allocated pursuant to this Section 4.1(b)(i) to the extent such allocation would cause any Limited Partner to have an Adjusted Capital Account Deficit at the end of such Allocation Year; and

(ii)     The balance, if any, 100% to the General Partner.

**4.2     Special Federal Income Tax Allocations.**  The following special allocations shall be made in the following order:

(a)     *Minimum Gain Chargeback.*  Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provisions of this Article 4, if there is a net decrease in Partnership Minimum Gain during any Allocation Year, each Partner shall be specially allocated items of Partnership income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Partner's

1st Amended/Restated L.P. Agreement
::ODMA\PCDOCS\DOCS\19844\3

12

share of the net decrease in Partnership Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f) (6) and 1.704-2(j) (2) of the Treasury Regulations. This Section 4.2(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)     *Partner Minimum Gain Chargeback.*  Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Article 4, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Allocation Year, each Partner who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i) (5) of the Treasury Regulations, shall be specially allocated items of Partnership income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Partner's share of the net decrease in Partner Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i) (4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i) (4) and 1.704-2(j) (2) of the Treasury Regulations. This Section 4.2(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i) (4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)     *Qualified Income Offset.*  In the event any Partner unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Partnership income and gain shall be specially allocated to such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible, provided that an allocation pursuant to this Section 4.2(c) shall be made only if and to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 4 have been tentatively made as if this Section 4.2(c) were not in the Regulations.

(d)     *Gross Income Allocation.*  In the event any Partner has a deficit Capital Account at the end of any Allocation Year which is in excess of the sum of (i) the amount such Partner is obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.2(d) shall be made only if and to the extent that such Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article 4 have been made as if Section 4.2(c) and this Section 4.2(d) were not in the Regulations.

8/13/2010          Amegy Bank Production          0074111
AMEGY007413
                                    EXHIBIT A ORIGINAL COMPLAINT

(e)    *Nonrecourse Deductions.* Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Partners in proportion to their respective Partnership Interests.

(f)    *Partner Nonrecourse Deductions.* Any Partner Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i) (1).

(g)    *Section 754 Adjustments.* To the extent an adjustment to the adjusted tax basis of any Partnership asset, pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Partner in complete liquidation of such Partner's interest in the Partnership, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in accordance with their interests in the Partnership in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Partner to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(h)    *Priority Allocation.* All or a portion of the remaining items of Partnership income or gain for the Allocation Year, if any, shall be specially allocated to the Partners in proportion to and to the extent of the excess, if any, of (i) the cumulative distributions each Partner has received pursuant to Section 4.7 and 9.4 hereof from the commencement of the Partnership to a date thirty (30) days after the end of such Allocation Year, over (ii) the cumulative items of income and gain allocated to such Partner pursuant to this Section 4.2(h) for all prior Allocation Years.

4.3    **Curative Allocations.** The allocations set forth in Sections 4.2(a), 4.2(b), 4.2(c), 4.2(d), 4.2(e), 4.2(f), 4.2(g) and 4.4 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss or deduction pursuant to this Section 4.3. Therefore, notwithstanding any other provision of this Article 4 (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of Partnership income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to Sections 4.1 and 4.2(h).

4.4    **Loss Limitation.** Losses allocated pursuant to Section 4.1 hereof shall not exceed the maximum amount of Losses that can be allocated without causing any Partner to have an Adjusted Capital Account Deficit at the end of any Allocation Year. In the event some but not all of the Partners would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 4.1 hereof, the limitation set forth in this Section 4.4 shall be applied on

8/13/2010           Amegy Bank Production           0074112
**AMEGY007414**

EXHIBIT A ORIGINAL COMPLAINT

a Partner by Partner basis and Losses not allocable to any Partner as a result of such limitation shall be allocated to the other Partners in accordance with the positive balances in such Partner's Capital Accounts so as to allocate the maximum permissible Losses to each Partner under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

**4.5    Other Allocation Rules.**

(a)    For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partner using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b)    The Partners are aware of the income tax consequences of the allocations made by this Article 4 and hereby agree to be bound by the provisions of this Article 4 in reporting their shares of Partnership income and loss for income tax purposes.

(c)    Solely for purposes of determining a Partner's proportionate share of the "excess nonrecourse liabilities" of the Partnership within the meaning of the Treasury Regulations Section 1.752-3(a) (3), the Partners' interests in Partnership profits are in proportion to their Partnership Interests.

To the extent permitted by Section 1.704-2(h) (3) of the Treasury Regulations, the General Partner shall endeavor to treat distributions of Available Cash as having been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Partner.

**4.6    Tax Allocations:**

(a)    *Code Section 704(c).*  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any Property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such Property to the Partnership for federal income tax purposes and its initial Gross Asset Value (computed in accordance with the definition of Gross Asset Value) using an acceptable allocation method pursuant to the Treasury Regulations under Section 704(c) as selected by the General Partner.

(b)    In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(c)    Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this

8/13/2010            Amegy Bank Production            0074113
**AMEGY007415**
                                                    EXHIBIT A ORIGINAL COMPLAINT

Agreement. Allocations pursuant to this Section 4.6 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

4.7  **Distributions**. Except as otherwise provided in Section 9.4 hereof, distributions of Available Cash shall be made as follows:

(a)  First, until Debt Distribution Payout, a monthly amount equal to zero point eight and one third percent (0.8333333%) of the remaining balance of the Debt Distribution Amount, determined as of the end of the preceding calendar month, to the Partners in accordance with their Partnership Interests;

(b)  Second, in an amount equal to the monthly Debt Distribution Amount until distributed in full, such amount to be apportioned between the Partners in proportion to their Partnership Interests;

(c)  Third, in the General Partners's sole discretion, to the extent there remains any Available Cash, it may be distributed to the Partners in proportion to their Partnership Interests. The General Partner has the authority to retain any amount of funds it deems advisable, in its sole discretion, in order to develop and expand the business of the Partnership.

(d)  Notwithstanding the foregoing, for the calendar months of July 1998 through December 1998, there shall be distributions of Available Cash equal to the following amounts:

(1)  to Royce Homes, Inc., cash equal to 100% of the July 1998 income allocated under Section 4.1(a)(vi)(1);

(2)  to Royce Homes, Inc., cash equal to 50% of the August 1998 income allocated under Section 4.1(a)(vi)(2);

(3)  to Royce Homes, Inc., cash equal to 50% of the September 1998 income allocated under Section 4.1(a)(vi)(3);

(4)  to Royce Homes, Inc., cash equal to 25% of the October 1998 income allocated under Section 4.1(a)(vi)(4);

(5)  to Royce Homes, Inc., cash equal to 25% of the November 1998 income allocated under Section 4.1(a)(vi)(5); and

(6)  to Royce Homes, Inc., cash equal to 25% of the December 1998 income allocated under Section 4.1(a)(vi)(6);

8/13/2010          Amegy Bank Production          0074114

**AMEGY007416**

EXHIBIT A ORIGINAL COMPLAINT

Each such distribution under this Section 4.7(d) shall be funded, subject to the Available Cash requirement, by the 15th day of the month following each month set forth above.

**4.8    Tax Distributions.** Notwithstanding the terms of Section 4.7, no later than (i) fifteen (15) days after the end of each period for which an individual estimated federal income tax payment is due, and (ii) one hundred twenty (120) days after the end of each Fiscal Year, the Partnership shall make a cash distribution from Available Cash to the Partners in accordance with their Interests in the smallest amount necessary so that the aggregate amount of distributions each Partner has received under this Agreement equals such Partner's Hypothetical Tax Amount. Any distribution under this Section 4.8 shall be taken into account in determining subsequent distributions under Section 4.7 so that each Partner receives the same aggregate distributions it would have received thereunder if this Section 4.8 were not contained in this Agreement.

**4.9    Offset of Distributions.** First Duvall Group, Inc. acquired their interests in the Partnership from Royce Homes, Inc. pursuant to a Partnership Interest Purchase Agreement dated as of the Effective Date. In the event First Duvall Group, Inc. certifies to the General Partner that it has a Claim (as that term is defined in the Partnership Interest Purchase Agreement) against Royce Homes, Inc. under the Partnership Interest Purchase Agreement, the General Partner shall distribute to First Duvall Group, Inc. any amounts otherwise distributable to Royce Homes, Inc., up to the amount of the Claim.

**4.10    Fee to Royce Homes, Inc.** Royce Homes, Inc. shall be paid a fee of one thousand five hundred dollars ($1,500) per House Start for each of the first two thousand (2,000) House Starts of the Partnership occurring on or after August 1, 1998. The Partnership shall account for and pay such amount to Royce Homes, Inc. upon funding of a loan for construction of a residence on such lot to be paid directly by the title company to Royce Homes, Inc. from the first draw on such construction loan. For federal income tax purposes only, such amounts shall be accounted for as a guarantee payment under Code Section 707(c).

### ARTICLE 5
### RIGHTS AND DUTIES OF THE GENERAL PARTNER

**5.1    Management.** Except as otherwise provided in this Agreement but consistent with the General Partner's fiduciary responsibility for the safekeeping and use of all Partnership Property, the General Partner shall have the full and exclusive power and authority on behalf of the Partnership to manage, control, administer and operate the business and affairs of the Partnership, and to do or cause to be done any and all acts which it deems to be necessary or appropriate thereto, and the scope of such power and authority shall encompass all matters in any way connected with or incident to such business, including, but not limited to, the power and authority:

    (a)    to expend the Partnership's capital and revenues in furtherance of the business of the Partnership;

    (b)    to enter into any partnership agreement, sharing arrangement, or joint venture which is engaged in any business or transaction in which the Partnership is authorized to engage;

8/13/2010          Amegy Bank Production          0074115
**AMEGY007417**
                                        EXHIBIT A ORIGINAL COMPLAINT

(c)    to borrow monies from time to time in the form of recourse or non-recourse borrowings or otherwise to draw, make, execute and issue promissory notes and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of the sums so borrowed and to mortgage, pledge, or assign in trust all or any part of the Partnership's Property;

(d)    to lend money to the Partnership on a recourse basis and charge the Partnership interest as provided in Section 3.4;

(e)    to employ or retain on behalf of the Partnership agents, employees, consultants, accountants, lawyers, appraisers, engineers, surveyors, land planners, architects, clerical personnel and such other assistance and services as may be necessary or convenient and to pay therefor such remuneration as the General Partner deems reasonable;

(f)    to purchase, lease, rent or otherwise acquire or obtain the use of machinery, equipment, tools, material and all other kinds and types of real or personal property in connection with carrying on the business of the Partnership;

(g)    to incur expenses for travel, entertainment, telephone, telegraph, insurance and for such other things, whether similar or dissimilar, as may be deemed necessary or appropriate for carrying on the business of the Partnership;

(h)    to guarantee the payment of money or the performance of any contract or obligation by any person, firm or corporation on behalf of the Partnership;

(i)    to sue and be sued, complain and defend in the name and on behalf of the Partnership and enter into such agreements, receipts, releases and discharges with respect to any such matters as the General Partner deems advisable;

(j)    to make such classifications, determinations and allocations as are deemed advisable, having due regard for relevant generally accepted accounting standards and real estate industry practices;

(k)    to purchase insurance at the Partnership's expense, to protect Partnership Property and the business of the Partnership against loss, and to protect the Partners against liability to third parties arising out of Partnership activities, such insurance, if any, to be in such limits, subject to such deductibles and to cover such risks as the General Partner deems appropriate;

(l)    to appear and transact business before regulatory authorities, make any and all applications, filings, submittals, reports, notices or take any other action needed on behalf of the Partnership to effect regulatory matters for Partnership activities;

(m)    to enter into, perform and carry out contracts, agreements and to do any other acts and things necessary, appropriate or incidental to the accomplishment of the purposes of the Partnership; and

8/13/2010          Amegy Bank Production          0074116
AMEGY007418
                                                EXHIBIT A ORIGINAL COMPLAINT

(n)   to cause the Partnership to borrow funds or accept other capital contributions without the consent of the Limited Partners.

**5.2   Reliance by Public.**

(a)   In order to expedite the handling of the Partnership's business and affairs, it is understood and agreed that any action taken, or document delivered, by the General Partner while acting in the name and on behalf of the Partnership shall be deemed to be the action of the Partnership as to any third parties (including all Limited Partners or their assignees as third parties for such purpose). Any person dealing with the Partnership or the General Partner shall be entitled to rely upon a certificate of the General Partner as to:

(i)   the identity of the Partners;

(ii)   the existence or nonexistence of any fact or facts that constitute conditions precedent to acts by the party delivering or receiving such certificate or which are in any other manner related to the affairs of the Partnership;

(iii)   the persons who are authorized to execute and deliver any instrument or document of the Partnership;

(iv)   any act or failure to act by the Partnership; or

(v)   any other matter whatsoever involving the Partnership or any Partner.

(b)   Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser shall be required to look to the application of proceeds hereunder or to verify any representation by the General Partner. Any such lender or purchaser shall be entitled to rely exclusively on the representations of the General Partner as to its authority to enter into such financing or sale arrangements and shall be entitled to deal with the General Partner, as if it were the sole party in interest therein, both legally and beneficially.

**5.3   Liabilities; Indemnification.**

(a)   THE GENERAL PARTNER SHALL NOT BE LIABLE TO THE PARTNERSHIP OR THE PARTNERS FOR ANY LOSS OR DAMAGE INCURRED BY THE PARTNERSHIP OR ANY PARTNER BY REASON OF ANY ACT OR OMISSION (WHETHER NEGLIGENT OR NOT) PERFORMED OR OMITTED BY THE GENERAL PARTNER IN GOOD FAITH AND IN A MANNER REASONABLY BELIEVED BY THE GENERAL PARTNER TO BE WITHIN THE SCOPE OF THE AUTHORITY GRANTED TO THE GENERAL PARTNER BY THIS AGREEMENT. THE PARTNERSHIP SHALL INDEMNIFY AND SAVE HARMLESS THE GENERAL PARTNER TO THE FULLEST EXTENT NOW OR HEREAFTER PERMITTED BY THE ACT.

(b)   Legal expenses and other costs incurred by the General Partner and its Affiliates on behalf of the Partnership shall be reimbursed on a monthly basis by the Partnership in advance of

8/13/2010           Amegy Bank Production           0074117
**AMEGY007419**
                                          EXHIBIT A ORIGINAL COMPLAINT

the final disposition of claims for which the General Partner may be entitled to be indemnified or held harmless, provided that each Person to whom reimbursement is to be made undertakes to repay funds so advanced if it is later determined by final, non-appealable judgment of a court of competent jurisdiction that such Person is not entitled to be indemnified or held harmless by the Partnership. The right of the General Partner to be indemnified and held harmless shall continue after the General Partner ceases to be a Partner. All rights of the General Partner under this Section shall inure to their respective successors and assigns.

5.4     **Title to Partnership Properties.** Title to all Partnership Property shall be taken, held and recorded in the name of the Partnership.

5.5     **Transfer of Interest of General Partner.**

(a)     The General Partner may not assign its right or delegate its responsibility to manage the affairs of the Partnership except as expressly permitted by this Agreement, or except with the consent of a Required Interest (and all Limited Partners hereby expressly consent that such an assignment, transfer or delegation may be effected upon such consent). The General Partner may transfer its share of the profits and distributions from the Partnership without receiving the consent or approval of any Partner.

(b)     The General Partner may assign all or any portion of its Interest in the Partnership to any General Partner admitted to the Partnership pursuant to Article 7.

(c)     Notwithstanding the foregoing, nothing in this Agreement shall be deemed to prevent (and all Limited Partners hereby expressly consent to) the transfer by the General Partner of all of its rights and Interest in the Partnership, and the delegation of all its obligations to the Partnership and the Partners to one or more Persons that have, as the result of a merger, consolidation, asset purchase, corporate reorganization, or other transaction, acquired all/or substantially all of the assets of the General Partner, and have assumed the obligations of the General Partner hereunder.

5.6     **Removal of General Partner.**     A General Partner may be removed by the affirmative vote of Partners holding at least eighty percent (80%) of the Partnership Interests, or as otherwise required by the Act.

5.7     **Compensation.** The General Partner shall be reimbursed by the Partnership for all expenses incurred for the direct benefit of the Partnership.

## ARTICLE 6
### RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

6.1     **Limitation of Liability.** No Limited Partner shall be liable to the Partnership for the debts, liabilities, contracts, or any other obligations of the Partnership, except to the extent of his Interest in the Partnership, and as provided herein.

6.2     **Management of Business.** No Limited Partner as such shall take part in the operation, management, or control of the Partnership business, transact any business in the Partner-

8/13/2010          Amegy Bank Production          0074118
AMEGY007420
                                        EXHIBIT A ORIGINAL COMPLAINT

ship's name, or have the power to sign documents for or otherwise bind the Partnership, except as may be required under the Act.

6.3     **Outside Activities.** A Limited Partner shall be entitled to have business interests and engage in business activities similar to the Partnership.

6.4     **Withdrawal.** A Limited Partner may not withdraw from the Partnership or sell, assign, transfer or subject to a security interest all or any portion of his Interest in the Partnership unless the written consent of the General Partner shall have been obtained, the granting or denial of which shall be within the sole and absolute discretion of the General Partner.

6.5     **Assignee's Rights.** An assignee of all or any part of a Limited Partner's Interest shall be entitled to receive distributions of cash or other property from the Partnership attributable to such Interest after the effective date of the assignment. The effective date of an assignment of an Interest under the provisions of this Article 6 for the purposes of Partnership accounting shall be the first date of the calendar month following the date on which all conditions precedent to such assignment provided for in this Agreement are, in the General Partner's opinion, fulfilled. An assignee of all or any part of a Limited Partner's Interest who does not become a Substitute Limited Partner in accordance with this Article shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books.

6.6     **No Liability of General Partner for Distributions.** Notwithstanding anything herein to the contrary, both the Partnership and the General Partner shall be entitled to treat the assignor of an Interest as the absolute owner thereof in all respects, and shall incur no liability for distributions of cash made to him, until such time as all conditions and requirements of this Article 6 have been met in the opinion of the General Partner.

6.7     **Substitute Limited Partner.**

(a)     The General Partner may, but need not, in its sole, absolute discretion, permit an assignee or transferee (whether such assignee or transferee has acquired his Interest by virtue of a voluntary assignment pursuant to this Article or an involuntary transfer by operation of law) of all or a portion of a Limited Partner's Interest to be and become a substitute limited partner (**"Substitute Limited Partner"**) in the Partnership entitled to all the rights and benefits under this Agreement of the transferor or assignor of such Interest; but no such assignee or transferee shall be or become a Substitute Limited Partner unless and until the General Partner consents in writing to the admission of such Person as a Substitute Limited Partner, which consent may be withheld in the absolute discretion of the General Partner. The Partners hereby consent and agree to such admission of a Substitute Limited Partner by the General Partner, and agree that the General Partner may, on behalf of each Partner and on behalf of the Partnership, cause the Partnership Agreement to be appropriately amended in the event of such admission.

(b)     Each assignee, as a condition to his admission as a Substitute Limited Partner, shall execute and acknowledge such instruments, in form and substance satisfactory to the General Partner, as the General Partner shall deem necessary or desirable to effectuate such admission and to confirm the agreement of the Substitute Limited Partner to be bound by all

8/13/2010          Amegy Bank Production          0074119
**AMEGY007421**
                                                 EXHIBIT A ORIGINAL COMPLAINT

the terms and provisions of this Agreement with respect to the Interest acquired. Without limiting the generality of the foregoing, such conditions may include the following:

> (i)  The assignee shall have agreed in writing to be bound by the terms and provisions of this Agreement and all amendments hereto;

> (ii)  If the assignee is a corporation, the assignee shall have provided the Partnership with a certified copy of a resolution by its Board of Directors authorizing it to become a Limited Partner under the terms and conditions of this Agreement;

> (iii)  The assignee shall have executed this Agreement and such other documents or instruments as the General Partner may require in order to effect the admission of such person or entity as a Limited Partner;

> (iv)  The assignee shall have executed a power of attorney containing the terms and conditions set forth in Section 2.11; and

> (v)  All expenses, including attorneys' fees and filing fees, incurred or expected to be incurred by the Partnership in connection with the admission of the Substitute Limited Partner shall be borne by such Substitute Limited Partner.

**6.8  Indemnification and Terms of Admission.** Each Limited Partner shall indemnify and hold harmless the Partnership, the General Partner and every other Limited Partner who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of or arising from (a) any actual or alleged misrepresentation or misstatement of facts or omission to state facts made by such Limited Partner in connection with any assignment, transfer, encumbrance or other disposition of all or any part of an Interest, or (b) the consent to or refusal of the General Partner to consent to the assignment or transfer of all or any part of such Limited Partner's Interest to the fullest extent provided by the Act and (c) the admission of or refusal to admit an assignee or transferee of all or any part of such Limited Partner's Interest as a Substitute Limited Partner against expenses for which the Partnership or such Partner has not otherwise been reimbursed (including attorneys' fees, judgments, fines and amounts paid in settlement) actually and reasonably incurred by his or it in connection with such action, suit or proceeding.

**6.9  Death or Incapacity of Limited Partner.** Upon the death, adjudication of bankruptcy, insanity or legal incapacity of a Limited Partner, the Interest of such Limited Partner shall pass to his heirs, legatees or legal representatives, who shall thereafter be considered assignees of such Interest. The consent of the General Partner to such an assignment or transfer shall not be required. Such heirs, legatees or legal representatives may be admitted as Substitute Limited Partners upon compliance with the provisions of this Article 6.

**6.10  No Dissolution Caused.** The death, bankruptcy, or insanity or expulsion pursuant to this Agreement of a Limited Partner shall not cause a dissolution of the Partnership. The admission of any additional or substitute General or Limited Partner shall not cause a dissolution of the Partnership.

8/13/2010          Amegy Bank Production          0074120
**AMEGY007422**
                              EXHIBIT A ORIGINAL COMPLAINT

## ARTICLE 7
### ADMISSION OF ADDITIONAL GENERAL PARTNERS

**7.1     Admission of Additional General Partner.** The General Partner may cause the Partnership to admit as an additional General Partner any Person controlling, controlled by or under common control with the General Partner. The Limited Partners hereby consent in advance to such an admission of an additional General Partner pursuant to this Section 7.1; *provided, however,* that such admission shall not in any manner reduce the Interest of the Limited Partners in the Partnership. Unless otherwise agreed by the General Partner and the Person to be admitted as an additional General Partner, the additional General Partner so admitted shall have the same rights and responsibilities as the General Partner under this Agreement.

## ARTICLE 8
### FISCAL YEAR; BOOKS OF ACCOUNT;
### BANK ACCOUNTS; AND REPORTS

**8.1     Books and Records.**

(a)     The General Partner, at the expense of the Partnership, shall maintain for the Partnership adequate books and records of account which shall be maintained, except as otherwise required by law, on the accrual basis of accounting containing, among other entries, Capital Accounts for each Partner kept in accordance with Article 3. The Partnership shall adopt the calendar year as its fiscal year.

(b)     The Limited Partners and their agents may examine, audit and obtain copies of the books, records and accounts of the Partnership, including federal, state, and local income tax returns for each year as and when they become available, inspect its properties, or otherwise make reasonable inquiry as to Partnership affairs. Any such inspections shall be conducted during the normal business hours of the General Partner. The General Partner may, however, keep confidential from other Partners for such period of time as the General Partner deems reasonable, any information which the General Partner reasonably believes to be in the nature of trade secrets or other information the disclosure of which the General Partner in good faith believes is not in the best interest of the Partnership or could damage the Partnership or its business or which the Partnership or General Partner is required by law or agreement with a third party to keep confidential. In the event the General Partner discloses to other Partners information which the General Partner deems confidential, the General Partner shall so advise the other Partner in writing and thereafter the Partner to whom such confidential information is disclosed shall thereafter maintain such information in strictest confidence unless and to the extent otherwise agreed in writing by the General Partner. All obligations to maintain the confidentiality of Partnership information arising under this Agreement or by virtue of applicable statutory or common law shall survive the withdrawal or removal of a Partner or the assignment of his interest in the Partnership.

**8.2     Bank Accounts.** All funds of the Partnership shall be deposited in its name in such bank account or accounts as may be designated by the General Partner. The General Partner and any persons authorized in writing by it to do so shall be authorized to draw checks on the bank accounts

8/13/2010            Amegy Bank Production            0074121
**AMEGY007423**
                                                    EXHIBIT A ORIGINAL COMPLAINT

of the Partnership. Each bank in which a Partnership account is maintained shall be relieved of any responsibility to inquire into the authority of the General Partner to deal with such funds.

8.3 **Tax Elections.**

(a) The parties agree that the General Partner shall make the following elections for the Partnership in the first and subsequent tax years:

(i) To elect December 31st as the end of the fiscal year of the Partnership; *provided, however,* that the fiscal year of the Partnership may be changed to any date approved by the General Partner;

(ii) To elect the accrual method of accounting or any other appropriate method;

(iii) To elect to have the General Partner be the "tax matters partner" pursuant to Section 6231(a)(7)(A) of the Code; and

(iv) To deduct expenses incurred in organizing the Partnership ratably over a 60-month period as provided in Code Section 709.

(v) Subject to the other provisions of this Section 8.3, all other elections required or permitted to be made by the Partnership under the Code shall be made by the General Partner in its sole discretion.

(vi) To elect, pursuant to Section 754 of the Code (or any corresponding provision or succeeding law), to adjust the basis of the Partnership Property.

(b) No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code, or from any similar provisions of any state tax laws.

8.4 **Tax Reporting Information.** The General Partner shall use its best efforts to furnish the Limited Partners a report within ninety (90) days after the close of the Partnership's fiscal year containing all tax reporting information reasonably necessary for federal income tax purposes including copies of the Partnership's federal income tax return on Form 1065.

8.5 **Reporting Expenses.** All expenses incurred by the General Partner in preparing (or causing to be prepared) reports to Limited Partners shall be paid by the Partnership as a Miscellaneous Expense.

8/13/2010          Amegy Bank Production          0074122
**AMEGY007424**

EXHIBIT A ORIGINAL COMPLAINT

## ARTICLE 9
### DISSOLUTION, WINDING UP AND TERMINATION; CONTINUATION

9.1    **Events of Dissolution.**

(a)    The Partnership shall be dissolved and its affairs wound up upon the first to occur of the following:

(i)    the expiration of its term as provided in Article 2;

(ii)    entry of a decree of judicial dissolution under the Act;

(iii)    the Limited Partners, with the concurrence of the General Partner, determine by written consent that the Partnership should be dissolved;

(iv)    an Event of Withdrawal occurs with respect to a General Partner;

(v)    the sale of all or substantially all of the Partnership's Interest in the Partnership Property and the collection and distribution of all sales proceeds; or

(vi)    the occurrence of any other event which under the Act causes the dissolution of a limited partnership.

(b)    As used in this Agreement an **"Event of Withdrawal"** shall have the meaning ascribed to that term in the Act.

(c)    Upon the occurrence of an Event of Withdrawal with respect to a General Partner, the General Partner shall cease to be a Partner of the Partnership. A General Partner who suffers an event that with the passage of the specified period becomes an Event of Withdrawal under the Act shall notify the other Partners of the event within thirty (30) days after the date of occurrence of the Event of Withdrawal.

(d)    Neither the death, dissolution, mental incompetency, nor bankruptcy of any Limited Partner nor the admission or substitution of a person as a Limited Partner in accordance with the terms hereof shall dissolve, or be deemed to dissolve, the Partnership or cause any interruption in or affect the continued existence of the Partnership and its business.

9.2    **Continuation of Business.**

(a)    Notwithstanding the provisions of Section 9.1(a)(4), the Partnership shall not be dissolved and shall not be required to be wound up if:

(i)    at the time an Event of Withdrawal occurs there remains at least one (1) General Partner and that General Partner or those General Partners elect to continue the business of the Partnership by written notice to all Partners within ninety (90) days after the Event of Withdrawal; or

8/13/2010          Amegy Bank Production          0074123
**AMEGY007425**

EXHIBIT A ORIGINAL COMPLAINT

(ii) within ninety (90) days after the Event of Withdrawal all remaining Partners agree in writing to continue the business of the Partnership and to the appointment, effective as of the date of the Event of Withdrawal, of one or more additional general partners if necessary or desired.

(b) In the event the Partnership is continued after an Event of Withdrawal, the Partnership shall promptly after the Event of Withdrawal and as a condition precedent to the further continuation of the business of the Partnership after such Event of Withdrawal (i) pay to the withdrawing General Partner all sums due and owing to the General Partner through the date of withdrawal, and (ii) assign by duly recordable instruments of assignment an undivided interest in the Partnership Property, whether tangible or intangible, real or personal, equal to the percentage interest that the withdrawing General Partner would share in revenues from the sale of such items of Partnership Property if such items of Property were sold in the ordinary course of business on the date the Event of Withdrawal occurred.

**9.3    Agreement of Successor General Partner.** A successor General Partner shall, upon consent to his admission by all of the Partners, be admitted as a General Partner of the Partnership upon his agreeing to be bound by the provisions of this Agreement to the same extent and on the same terms and conditions as the then General Partner, if any, or, if none, as the General Partner most recently withdrawn. Any such successor General Partner shall, as a condition of receiving any interest in the Partnership, also agree to be bound by any contracts, leases, instruments or other documents theretofore executed and delivered on behalf of the Partnership to the same extent and on the same terms and conditions as specified in the preceding sentence.

**9.4    Liquidation.** Upon dissolution of the Partnership, the General Partner (or, if there shall not be any remaining General Partners, a special liquidator [herein called the "**Liquidator**"] appointed by a Required Interest) shall proceed with the winding up of the Partnership and shall distribute the assets of the Partnership in the following order of priority:

(a) To creditors, including Partners who are creditors, to the extent permitted by law, in satisfaction of liabilities of the Partnership (whether by payment or the making of reasonable provision for payment thereof) other than liabilities for which reasonable provision for payment has been made and other than liabilities to Partners for distributions;

(b) To the setting up of any reserve which such General Partner (or the Liquidator, where applicable) shall reasonably deem advisable to provide for any contingent or unforeseen liabilities or obligations of the Partnership;

(c) To the Partners and former Partners in satisfaction of liabilities for distributions; and

(d) To the Partners in accordance with their relative positive Capital Account balances.

8/13/2010          Amegy Bank Production          0074124
**AMEGY007426**

EXHIBIT A ORIGINAL COMPLAINT

At the expiration of such period of time as the General Partner (or, where applicable, the Liquidator) shall deem advisable, the remaining balance of any reserve established in accordance with clause (b) shall be distributed in the manner set forth in clause (d).

**9.5    Distributions in Kind.**  In the event the General Partner (or, where applicable, the Liquidator) determine that it is necessary or desirable upon dissolution to make a distribution of any property of the Partnership in kind, such property shall be transferred and conveyed on the basis of the fair market value thereof to the Partners or their assignees, so as to vest in each of them an undivided interest, as tenants-in-common, in the whole of such property equal to their relative positive Capital Account balances.  Any Partnership Property distributed in kind shall be subject to such liens, encumbrances and restrictions or affect such Partnership Properties on the date of distribution and will be subject to and operated in accordance with any operating agreements then in effect.

**ARTICLE 10**
AMENDMENT OF PARTNERSHIP AGREEMENT

**10.1    Amendments to be Adopted Solely by General Partner.**  The General Partner (pursuant to this Section and its power of attorney from the Limited Partners), without the consent of any Limited Partner, may amend any provision of this Agreement, and execute, swear to, acknowledge, deliver, file, and record whatever documents may be required in connection therewith, to reflect:

(a)    a change in the name of the Partnership, the location of the principal place of business of the Partnership, the registered office of the Partnership or the registered agent of the Partnership;

(b)    the admission or removal of any Partner in accordance with this Agreement;

(c)    a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or any change that is necessary or advisable in the opinion of the General Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for federal income tax purposes;

(d)    to cure any ambiguity in this Agreement or to correct or supplement any provisions hereof which may be inconsistent with any other provision hereof;

(e)    to amend the provisions of this Agreement in response to changes in the Code or regulations thereunder or other developments in the law applicable to the taxation of the Partnership or its Partners, if the General Partner concludes in good faith that such amendments are in the overall best interests of the Partners; *provided, however,* that the General Partner shall be under no obligation to make any such amendment; and

(f)    any other amendments similar to the foregoing.

8/13/2010          Amegy Bank Production          0074125
**AMEGY007427**
                                             EXHIBIT A ORIGINAL COMPLAINT

**10.2    Amendments to be Adopted with Consent of Limited Partners.**  Except as provided in Section 10.1, all amendments to this Agreement shall be made in accordance with the following requirements:

(a)    Amendments to this Agreement may be proposed by the General Partner or by Limited Partners holding at least 50% of the aggregate Partnership Interests.

(b)    Following any proposal of an amendment the General Partner shall, within fifteen (15) days after receipt of such proposal, mail to all Partners a verbatim statement of the proposed amendment and any alternative or additional proposal by the General Partner. The General Partner may include in such submission its recommendation as to the proposed amendments and may (but shall not be required to) solicit the proxies of the Limited Partners to vote on such proposals or any other matter which may come before the meeting at which such proposal(s) will be voted upon. Such proposed amendment may be voted upon by the Limited Partners by written vote in lieu of a meeting or at a meeting in person or by proxy, as specified by the General Partner in such notice of proposed amendment. The General Partner must include in such submission the date on which the meeting will be held to vote on such proposed amendment or the date by which written votes must be received by the General Partner. Such date must be not less than fifteen (15) days nor more than thirty (30) days after the date of mailing of such submission to the Limited Partners; *provided, however,* that if voting is by written consent, the General Partner may deem such proposed amendment to be approved or rejected before the expiration of such fifteen (15) day period if the General Partner has received a sufficient number of votes to approve or reject the proposed amendment.

(c)    Except as otherwise provided in this Agreement, the affirmative vote of Limited Partners holding a Required Interest shall be required to amend this Agreement or approve or disapprove any proposal. If the General Partner determines that voting on such proposal or proposals shall be by written vote in lieu of a meeting and the written vote of a Limited Partner in the form submitted to the Limited Partner by the General Partner is not actually received by the General Partner on or before the date such written vote is due, such Limited Partner shall be deemed to have voted on the proposal or proposals in accordance with the recommendation or recommendations, if any, of the General Partner. If no recommendation of the General Partner was submitted to the Limited Partners, the failure to timely vote in the form submitted to a Limited Partner shall constitute a vote against all proposals.

**10.3    Consent of General Partner Required.**  Notwithstanding the foregoing provisions of this Article 11, the consent of the General Partner shall be required for any amendment which would:

(a)    change the General Partner's sharing of costs and revenues or any item of income, gain, loss, deduction or credit;

(b)    increase the General Partner's duties under this Agreement or General Partner's liabilities, whether fixed or contingent;

8/13/2010          Amegy Bank Production          0074126
**AMEGY007428**
                                                    EXHIBIT A ORIGINAL COMPLAINT

(c)     modify the provisions of this Agreement relating to removal or replacement of the General Partner;

(d)     have or is reasonably expected to have a materially adverse effect on the General Partner; or

(e)     amend this Section 10.3.

### ARTICLE 11
### RESTRICTIONS ON DISPOSITION OF PARTNERSHIP INTEREST

**11.1     Death, Insanity or Bankruptcy of a Partner.**  In the event of the death, dissolution or legal disability of a Partner or in the event a Partner becomes a Bankrupt Partner, in any of such occurrences said Partner shall be deemed a "*Disabled Partner*". In the event of a Partner becoming a Disabled Partner, such Disabled Partner shall and does hereby grant the remaining Partners the option to purchase the Disabled Partner's Partnership Interest at the price and on the terms set forth in Section 11.2. In the event of any such event causing a Partner to be a Disabled Partner, the other Partners shall be given immediate notice thereof by the Disabled Partner, stating the date and circumstances of the event causing a Partner to be a Disabled Partner (the "*Notice*"). For a period of thirty (30) days after the receipt of the Notice, the other Partners shall have the option to elect to purchase all, but not less than all, of the Partnership Interest of the Disabled Partner at the Agreed Value determined in Section 11.2 and on the terms described in Section 11.2. Each Partner desiring to participate in the purchase of such Partnership Interest shall give the Disabled Partner and the other Partners written notice of his, her or its exercise of such option within such thirty day period. The option to purchase such Partnership Interest shall exist in favor of those Partners affirmatively electing to purchase such Partnership Interest in accordance herewith, in such proportions as may be mutually agreed upon in writing or, in the absence of such agreement, pro-rata; and upon the consummation of the purchase of such Partnership Interest, the Partnership Interest of the Partners shall be adjusted accordingly.

**11.2     Price and Terms.**

(a)     In the case of purchase by any Partner as set forth in Section 11.1, the purchase price of such Partnership Interest shall be the Agreed Value (as hereinafter defined), which shall also be the purchase price in the case of all other transfers (except as set forth in Sections 11.3, 11.4, 11.5 and 11.6 below), as of the end of the last month preceding the Value Date (as hereinafter defined) multiplied by the transferring Partner's Percentage Interest.

(b)     The "*Value Date*" shall be the date a Partner becomes a Disabled Partner, as set forth in Section 11.1.

(c)     "*Agreed Value*" shall be fair market value which, for these purposes, shall be, absent an agreement by the parties to such purchase and sale, that value that would be, in the opinion of the appraisers selected in accordance with this Agreement, negotiated by a willing buyer and a willing seller, each of whom is fully informed and neither of whom is under any

8/13/2010          Amegy Bank Production          0074127
**AMEGY007429**
EXHIBIT A ORIGINAL COMPLAINT

compulsion to buy nor compulsion to sell and further taking into account all facts and circumstances believed by the appraisers to be reasonable and appropriate.

(d) Whenever, under this Agreement, an event occurs which requires or permits the appointment of an appraiser, fair market value shall be determined by an appraisal conducted by an independent brokerage or appraisal firm selected by the mutual written agreement of the proposed seller and the purchasing Partner(s) not affiliated with the proposed seller. All expenses of appraisal under this Section 11.2 shall be payable one-half by the proposed purchaser(s) and one-half by the proposed seller whether or not the offer under this Agreement is accepted or the closing hereunder occurs.

(e) If the appropriate parties are unable to agree upon an appraiser within thirty (30) days after any of them have given notice of request for appointment of an appraiser, then each of the proposed seller and the proposed purchaser(s) shall appoint an appraiser and the appraisers so selected shall determine jointly the Agreed Value within thirty (30) days after the appointment of the last of such appraisers, and their determination shall be final and conclusive on the parties. All expenses of appraisal under this Section 11.2 shall be paid, as to each appraiser, by the party selecting such appraiser.

(f) If the appraisers elected under Subsection 11.2(e) are unable to reach a joint determination of Appraised Value within the time period provided in Subsection 11.2(e), then such appraisers shall promptly submit their respective appraisal reports, together with supporting documentation, to a third appraiser mutually selected by the first two appraisers, which third appraiser shall, within an additional thirty (30) day period, determine the Agreed Value and such determination shall be final and conclusive as to all parties hereto. All expenses of the third appraiser shall be payable one-half by the proposed purchaser(s) and one-half by the proposed seller.

(g) In the event appraisal is required, all parties hereto agree to provide the appraisers access to such information, books and records and other data as reasonably requested and documentation (including matters that may be deemed confidential) and to fully and promptly cooperate with requests by the appraisers for information regarding the Partnership or its business or assets.

(h) Notwithstanding anything to the contrary in this Agreement, the closing of any purchase and sale of Partnership Interests under this Agreement with respect to which the price is determined in part based upon the determination of appraisers, shall be extended to a date one hundred twenty (120) days after the delivery to the proposed purchaser(s) and the proposed seller of the determination of Agreed Value.

(i) There shall be deducted from the price the amount of any indebtedness owing to the proposed purchaser(s) by the proposed seller.

(j) The Agreed Value shall be paid in cash or by wire transfer of immediately available funds at the time of closing.

8/13/2010          Amegy Bank Production          0074128
AMEGY007430
                                         EXHIBIT A ORIGINAL COMPLAINT

**11.3    Voluntary Buy-Sell.** Notwithstanding the provisions of <u>Section 11.2</u> above or any other provision of this Agreement:

(a)    In the event that one Partner (the "<u>Offering Partner</u>") is willing to make an offer to the other Partner (the "<u>Offeree</u>") either to purchase all of the Offeree's Partnership Interest or to sell to the Offeree all of the Offering Partner's Partnership Interest, the Offering Partner shall notify the Offeree in writing of his, her or its desire to do so, designating in such notice the price at which the Offering Partner will either sell the Offering Partner's Partnership Interest to the Offeree or buy the Partnership Interest of the Offeree, and designating the date (the "<u>Offer Date</u>") of such notice. In such notice the Offering Partner shall specify that the offer is being made pursuant to this <u>Section 11.3</u>. The price (the "<u>Purchase Price</u>") shall be stated in terms of a purchase price for the Partnership Interest. The Offering Partner shall then be obligated either:

(i)    to purchase the Partnership Interest of the Offeree at a price equal to the purchase price for the Partnership Interest offered by the Offering Partner; or

(ii)    to sell to the Offeree the Offering Partner's Partnership Interest at a price equal to the purchase price for the Partnership Interest offered by the Offering Partner.

(b)    Within thirty (30) days of the Offer Date, the Offeree shall give written notice to the Partnership and to the Offering Partner of the Offeree's decision to purchase or decision not to purchase the Offering Partner's Partnership Interest.

(c)    If the Offeree elects to purchase the Offering Partner's Partnership Interest in accordance with this <u>Section 11.3</u>, the Offeree shall purchase the Partnership Interest of the Offering Partner at the price determined pursuant to <u>Subsection 11.3(a)(ii)</u>.

(d)    In the event that the Offeree shall fail to timely elect to purchase the Offering Partner's Partnership Interest pursuant to this <u>Section 11.3</u>, the Offeree shall be deemed to have elected to sell the Offeree's Partnership Interest to the Offering Partner at the price determined pursuant to <u>Subsection 11.3(a)(i)</u>.

(e)    A closing for the sale of a Partnership Interest pursuant to this <u>Section 11.3</u> shall be held at the office of the Partnership on a date designated by the purchasing party no later than one hundred twenty (120) days after the expiration of the thirty (30) day period described in <u>Subsection 11.3(b)</u>. The Purchase Price of a Partnership Interest purchased in accordance with this <u>Section 11.3</u> shall be payable in cash or by wire transfer of immediately available funds at the time of the closing.

(f)    The respective obligations of the Offering Partner and the Offeree to purchase or sell, as the case may be, a Partnership Interest in the Partnership shall be specifically enforceable.

8/13/2010            Amegy Bank Production            0074129
**AMEGY007431**
                                EXHIBIT A ORIGINAL COMPLAINT

### 11.4 Rights to Compel Sale.

(a)    Partners owning a Partnership Interest in excess of fifty percent (50%) of the aggregate Partnership Interests ("_Compelling Holders_") shall have the right, in connection with a bona fide offer (a "_Compelled Sale Offer_") by a third party which is not a Partner or an Affiliate of any Partner (a "_Compelled Sale Purchaser_") to purchase for cash all of the Partnership Interest held by the Compelling Holders, exercisable as set forth below, to require, to the extent permitted by law, each and every one (but not less than every one) of the Partners to sell all, but not less than all, of the Partnership Interests then held by such Partners, to the Compelled Sale Purchaser, for the same consideration per Partnership Interest (the "_Compelled Sale Offer Price_") and otherwise on the same terms and conditions upon which the Compelling Holders sell their Partnership Interests to the Compelled Sale Purchaser.

(b)    If the Compelling Holders elect to exercise their right to compel sale pursuant to this Section 11.4, the Compelling Holders shall deliver written notice (a "_Compelled Sale Notice_") of the Compelled Sale Offer to each Partner and the Partnership, setting forth the Compelled Sale Offer Price, the identity of the Compelled Sale Purchaser and the other terms and conditions thereof. Each Partner shall deliver to a representative of the Compelling Holders designated in the Compelled Sale Notice in escrow, not less than five (5) business days before the proposed date of consummation of the Compelled Sale Offer, duly endorsed certificates representing all of the Partnership Interest subject to the Compelled Sale Notice, together with a limited power-of-attorney authorizing the Compelling Holders to transfer such Partnership Interest to the Compelled Sale Purchaser pursuant to the terms of the Compelled Sale Offer at the Compelled Sale Offer Price, and in accordance with the provisions hereof. The Compelling Holders shall have ninety (90) days from the date the Compelled Sale Notice is received by the Partners (the "_Compelled Sale Notice Date_") to sell to the Compelled Sale Purchaser at the Compelled Sale Offer Price all of the Partnership Interests subject to the Compelled Sale Notice. Immediately after completion of any such sale pursuant to this Section 11.4, the Compelling Holders shall notify the Partnership and each Partner of such completion and shall furnish such evidence of such sale (including time of completion) and of the terms thereof as the Partnership or any Partner may request. The Compelling Holders shall substantially concurrently with such closing also remit to each Partner the proceeds of such sale attributable to the sale of such Partner's Partnership Interest immediately upon receipt thereof; provided that if any Partner fails to deliver the certificates evidencing its Partnership Interest to the designated representative of the Compelling Holders in accordance with this Subsection 11.4(b), the Compelling Holders shall hold such proceeds in escrow until such Defaulting Partner so delivers such certificates. If any sale to a Compelled Sale Purchaser is not completed by the expiration of the ninety (90) day period referred to in this Subsection 11.4(b), then, without prejudice to the Compelling Holders' right to seek to compel a sale under this Section 11.4 in the future, the Compelling Holders shall return to each Partner all certificates representing the Partnership Interest of such Partner.

(c)    No Partner required to sell a Partnership Interest pursuant to a Compelled Sale Offer shall be required to make any representation or warranty in connection with such

8/13/2010          Amegy Bank Production                    0074130
AMEGY007432
                                                EXHIBIT A ORIGINAL COMPLAINT

Compelled Sale Offer other than as to such Partner's ownership and authority to transfer, free of liens, claims and encumbrances, the Partnership Interest to be sold by it.

## 11.5 Tag-Along Rights.

(a)    If one or more Partners (the "*Tag-Along Seller*") propose to transfer in a transaction or series of related transactions Partnership Interest which is greater than fifty percent (50%) of the aggregate Partnership Interests (collectively, the "*Tag-Along Shares*") to one or more third parties (a "*Tag-Along Purchaser*") pursuant to a bona fide offer to purchase (a "*Tag-Along Offer*"), the Tag-Along Seller shall provide written notice (the "*Tag-Along Offer Notice*") of such Tag-Along Offer to the Partnership and each of the other Partners in the manner set forth in this Section 11.5 (the date of receipt of such notice by each such party being the "*Tag-Along Notice Date*"). The Tag-Along Offer Notice shall identify the Tag-Along Purchaser, the Partnership Interest proposed to be purchased by the Tag-Along Purchaser, the Tag-Along Ratio (as defined in Subsection 11.5(d)), the consideration offered per Partnership Interest (the "*Tag-Along Offer Price*"), any other material terms and conditions of the Tag-Along Offer and, in the case of a Tag-Along Offer in which the Tag-Along Offer Price consists in part or in whole of consideration other than cash, such information relating to such consideration as the Partnership or any Partner may reasonably request in order to evaluate such non-cash consideration.

(b)    The Tag-Along Offer Price paid to any Partner shall not be less than the highest price paid per Partnership Interest to the Tag-Along Seller pursuant to the Tag-Along Offer and the remaining terms shall be no less favorable than those granted to the Tag-Along Seller. Each of the Partners that wishes to accept the Tag-Along Offer (a "*Participating Partner*") shall, within twenty (20) days after the Tag-Along Notice Date (the "*Tag-Along Notice Period*"), provide the Tag-Along Seller with an irrevocable written notice (a "*Tag-Along Notice*") specifying the Partnership Interest that such Participating Partner wishes to transfer and shall simultaneously provide a copy of such Tag-Along Notice to the Partnership.

(c)    Not less than seven (7) days prior to the proposed date of any transfer pursuant to a Tag-Along Offer (the "*Transfer Date*"), which date may not be earlier than fourteen (14) days after the termination of the Tag-Along Notice Period, the Tag-Along Seller shall notify the Partnership and each Participating Partner of the Transfer Date. Not less than three (3) days prior to the Transfer Date, each Participating Partner shall deliver to the Tag-Along Seller the duly endorsed certificate or certificates representing the Partnership Interests to be transferred pursuant to such offer by the Participating Partner, together with a limited power of attorney authorizing the Tag-Along Seller to transfer such Partnership Interest pursuant to the terms of the Tag-Along Offer and the provisions hereof and all other documents required to be executed in connection with such Tag-Along Offer.

(d)    Each Participating Partner shall have the right to transfer (and the Tag-Along Seller shall reduce its Partnership Interest to be sold by a corresponding number), pursuant to the Tag-Along Offer, a Partnership Interest equal to the product of the total Partnership Interest offered to be purchased by the Tag-Along Purchaser as set forth in such Tag-Along Offer multiplied by a fraction (the "*Tag-Along Ratio*"), the numerator of which shall be the

8/13/2010          Amegy Bank Production          0074131
AMEGY007433
                                          EXHIBIT A ORIGINAL COMPLAINT

aggregate Partnership Interest owned by such Participating Partner and the denominator of which shall be the Partnership Interest owned by the Participating Partners and the Tag-Along Seller. If, at the termination of the Tag-Along Notice Period, any Partner shall not have accepted the Tag-Along Offer, such Partner will be deemed to have waived any and all of its rights under this Section 11.5 with respect to the transfer of any of its Partnership Interests pursuant to such Tag-Along Offer (as set forth in the relevant Tag-Along Offer Notice).

(e)  The Tag-Along Seller shall have ninety (90) days from the conclusion of the Tag-Along Notice Period in which to consummate the transfer contemplated by the Tag-Along Offer to the Tag-Along Purchaser at the price and on the terms contained in the Tag-Along Offer Notice. If, prior to the expiration of such ninety (90) day period, any Compelled Sale Notice shall be delivered pursuant to Section 11.4, the right of the Tag-Along Seller to effect such transfer shall terminate and the provisions of Section 11.4 shall apply. Any material change in the terms of the Tag-Along Offer (it being understood that any reduction in price is material) will require the submission of a new Tag-Along Offer Notice and the recommencement of compliance with all of the other provisions of this Section 11.5. If, at the end of such ninety (90) day period, the Tag-Along Seller shall not have completed the transfer contemplated by the Tag-Along Offer Notice, the right of the Tag-Along Seller to effect such transfer shall terminate, and the Tag-Along Shares subject to such proposed transfer shall again be subject to all the restrictions on sale or other disposition and other provisions contained in this Agreement.

(f)  Substantially concurrently with the consummation of the transfer of a Partnership Interest pursuant to the Tag-Along Offer, the Tag-Along Seller shall notify the Participating Partners, shall remit to each of the Participating Partners the total sales price specified in the Tag-Along Offer Notice of the Partnership Interests of such Participating Partner transferred pursuant thereto, and shall furnish such other evidence of such transfer (including the time of completion) and the terms thereof as may be reasonably requested by such Participating Partners.

(g)  No Participating Partner shall be required to make any representation or warranty in connection with the Tag-Along Offer other than as to such Participating Partner's ownership and authority to transfer, free of liens, claims and encumbrances, the Partnership Interest proposed to be transferred by it.

**11.6  Right of First Offer.** Subject to the terms and conditions specified in this Section 11.6, each Partner ("*Selling Holder*") shall grant each other Partner a right of first offer with respect to any sale, assignment or other conveyance of such Selling Holder's Partnership Interest (other than a sale pursuant to Section 11.4 or Section 11.5). Each time a Selling Holder proposes to sell its Partnership Interest, such Selling Holder shall first offer such Partnership Interest ("*Sale of Partnership Interest*") to each other Partner in accordance with the following provisions:

(a)  the Selling Holder shall deliver a notice ("*Sale Notice*") to each other Partner and to the Partnership stating (i) its bona fide intention to offer to sell, assign or otherwise convey the Sale Partnership Interest, (ii) the Sale Partnership Interests to be sold, assigned

8/13/2010                    Amegy Bank Production                    0074132
AMEGY007434
EXHIBIT A ORIGINAL COMPLAINT

or otherwise conveyed, and (iii) the price and terms upon which it proposes to offer the Sale Partnership Interest.

(b)     By written notification received by the Selling Holder, within twenty (20) calendar days after receipt of the Sale Notice, a Partner may offer to purchase all (but not less than all) of the Sale Partnership Interests at the price in cash and on the terms specified in the Sale Notice, or at any higher price.

(c)     Provided that the offered price is equal to or exceeds the price specified in the Sales Notice, the Selling Holder shall sell the Sale Partnership Interest to the Partner offering the highest price for such Sale Partnership Interest with the purchase price to be paid in cash within twenty (20) calendar days following receipt of notification pursuant to Subsection 11.6(b). If more than one Partner shall offer to purchase the Sale Partnership Interest at such highest price the Sale Partnership Interest shall be allocated among such Partners pro rata in proportion to the Partnership Interest owned by each of them. If no Partner offers to purchase all the Sale Partnership Interest at or above the price specified by the Selling Holder in the Sale Notice within the period specified in Subsection 11.6(b) or such later period during which the purchase price is to be paid, then such Selling Holder may offer the Sale Partnership Interests to third parties at a price not less, and upon terms no more favorable to the offeree, than those specified in the Sale Notice. If such Selling Holder does not enter into an agreement for the sale of the Sale Partnership Interest within ninety (90) days of the expiration of either (i) the period specified in Subsection 11.6(b) or (ii) such later period during which the purchase price is to be paid, whichever is applicable, then the right of first offer provided in this Section 11.6 shall be deemed to be revived and such Sale Partnership Interests shall not be offered or sold unless first offered again to all other Partners in accordance with the provisions of this Section 11.6.

*11.7     Priority of Rights.* In the event one or more of the provisions of this Article 11 are triggered or effective concurrently, they shall be given effect in the order in which they appear in this Article 11.

## ARTICLE 12
### MISCELLANEOUS PROVISIONS

**12.1     Notices.** Any notices, requests, demands or other communications herein required or permitted to be given shall be in writing and may be personally served or sent by telex or mail and shall be deemed to have been given as follows: if personally served, when served; if by telex, on the second day after transmission thereof on a telex machine to the proper address and number with confirmed answerback; or if mailed, on the third day after deposit in first class mail with postage pre-paid and properly addressed. For purposes of this Section 12.1, the address of each Limited Partner shall be the address provided the General Partner in writing of a change of address, and the address of the General Partner shall be the same as the principal place of business of the Partnership.

**12.2     Execution and Counterparts.** This Agreement may be executed in any number of counterparts and by facsimile transmission with the same effect as if all parties hereunder had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

8/13/2010              Amegy Bank Production              0074133
**AMEGY007435**
                                          EXHIBIT A ORIGINAL COMPLAINT

**12.3    Waiver of Partition.** Each Partner hereby irrevocably waives during the term of the Partnership any right that it or he may have to maintain any action for partition with respect to any Partnership Property.

**12.4    Governing Law, Successors, Severability.** The internal affairs of the Partnership and the relative rights of the parties to this Agreement shall be governed by the laws of the State of Delaware, as such laws are applied by Delaware courts to agreements entered into and to be performed in Delaware by and between residents of Delaware, and shall, subject to the restrictions on transferability set forth herein, bind and inure to the benefit of the heirs, executors, legal representatives, successors and assigns of the parties hereto. All other rights and remedies shall be governed by the laws of the State of Texas. If any provision of this Agreement shall be held to be invalid, the remainder of this Agreement shall not be affected thereby.

**12.5    Integrated Agreement.** This Agreement executed by the Limited Partners constitutes the entire agreement among the parties. This Agreement supersedes any prior agreement or understandings among them, oral or written, all of which are hereby canceled. This Agreement may not be modified or amended other than pursuant to Article 10.

**12.6    No Waiver.** The failure of any Partner to seek redress for violation, or to insist on strict performance, of any covenant or condition of this Agreement shall not prevent a subsequent act which would have constituted a violation from having the effect of an original violation.

**12.7    Legends.** If certificates are issued evidencing a Limited Partner's Interest in the Partnership, each such certificate shall bear such legends as may be required by applicable federal and state laws, or as may be deemed necessary or appropriate by the General Partner to reflect restrictions upon transfer contemplated herein.

**12.8    Presumptions.** Any act or omission performed or omitted by the General Partner on advice of legal counsel or an independent consultant who has been employed or retained by the Partnership shall be presumed to have been performed or omitted in good faith. The termination of any action, suit or proceeding by judgment, order, or settlement shall not, of itself, create a presumption that any such party did not act in good faith and in the best interests of the Partnership.

**12.9    Time of Essence.** Time shall be of the essence in the performance of this Agreement.

SIGNATURE PAGE FOLLOWS

8/13/2010          Amegy Bank Production          0074134
AMEGY007436
                                    EXHIBIT A ORIGINAL COMPLAINT

IN WITNESS WHEREOF, this Agreement is executed as of July ____, 1998.

| Partner's Signature | Partner's Name and Address | Partnership Interest |
|---|---|---|
| HAMMERSMITH GROUP, INC. <br><br> By: _____ <br> John Speer, President | Hammersmith Group, Inc. <br> 14614 Falling Creek, Suite 250 <br> Houston, Texas 77068 | 1 % <br> General Partnership <br> Interest |
| ROYCE HOMES, INC. <br><br> By: _____ <br> Mike Manners, President | Royce Homes, Inc. <br> 14614 Falling Creek, Suite 250 <br> Houston, Texas 77068 | 50 % <br> Limited Partnership <br> Interest |
| First Duvall Group, Inc. <br><br> By: _____ <br> John Speer, Chief Exec. Officer | 14614 Falling Creek, Suite 250 <br> Houston, Texas 77068 | 49 % <br> Limited Partnership <br> Interest |
| | **Total** | **100 %** |

1st Amended/Restated L.P. Agreement
::ODMA\PCDOCS\DOCS\198449\3

8/13/2010          Amegy Bank Production          0074135
**AMEGY007437**
                                        EXHIBIT A ORIGINAL COMPLAINT

## AMENDMENT TO LIMITED PARTNERSHIP AGREEMENT
## OF ROYCE HOMES, L.P.

This amendment to the Agreement of Limited Partnership of Royce Homes, L.P., a Delaware limited partnership ("Amendment") is made and entered into effective as of the____ day of _____ 1998, by and between Hammersmith Group, Inc., as the General Partner, and Royce Homes, Inc., as the Limited Partner.

### RECITAL

The partners desire to provide the General Partner authority to appoint officers of the Partnership.

### AMENDMENT

Subsections 5.1(m), (n), and (o) of the Agreement shall be amended and restated as follows:

"(m)    to enter into, perform and carry out contracts, agreements and to do any other acts and things necessary, appropriate or incidental to the accomplishment of the purposes of the Partnership;

(n)    to cause the Partnership to borrow funds or accept other capital contributions without the consent of the Limited Partners; and

(o)    to appoint officers of the Partnership."

As amended by this Amendment, the Agreement of Limited Partnership of Royce Homes, L.P. remains in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

### [SIGNATURE PAGE FOLLOWS]

EXHIBIT A ORIGINAL COMPLAINT

**GENERAL PARTNER:**

HAMMERSMITH GROUP, INC.

By: _____

John Speer, President

**LIMITED PARTNERS:**

DWM HOLDINGS, INC.

By: _____

Mike Manners, President

EXHIBIT A ORIGINAL COMPLAINT