IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| Royce Homes, L.P | § | Case No.  09-32467-H4-7 |
|     Debtor | § | |
| | § | CHAPTER 7 |
| ******************************** | § | |
| | § | |
| Rodney Tow, Trustee | § | |
|     Plaintiff | § | |
| | § | Adversary No. 11-03191 |
| vs. | § | |
| | § | |
| John H. Speer, Amegy Bank, N. A., | § | |
| Amegy Mortgage Company LLC, | § | |
| Michael Manners, Donnie Lou Speer, | § | |
| Vestalia, LLC, Hammersmith Group, | § | |
| LLC f/k/a Hammersmith Group, Inc., | § | |
| Park Lake Communities, L.P., | § | |
| Watermark Land, LLC, Watermark | § | |
| Land, LP, Watermark Tortuga, LLC, | § | |
| Allard Investment Company, L.L.C., | § | |
| DWM Holdings, Inc.,  MGM Motor | § | |
| Sports, L.L.C., George Kopecky, | § | |
| Saracen Holdings, Inc., Saracen | § | |
| Holdings, L.P. and Saracen Holdings | | |
| GP, L.L.C. | | |
|     Defendants | | |

## Trustee's Response to Amegy Bank National Association's and Amegy Mortgage Company, L.L.C.'s Motion to Dismiss Certain Claims Pursuant to Fed.R.Civ.P. 12
### (Refers to Docket No. 70)

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE, JEFF BOHM:**

    Rodney Tow, the Chapter 7 Trustee (the "Trustee") of the estate of Royce Homes, LP

(the "Debtor") files this Response and would show the Court as follows:

1.      The Trustee has amended his Complaint in an effort to resolve issues raised by the Defendants in the Motions to Dismiss.  The Trustee will refer to the original Complaint as the "Complaint" and the amended version as the "Amended Complaint."

### The Trustee Asserts Amegy Bank and Amegy Mortgage Aided and Abetted, Conspired or Acted in Concert to Commit Fraud

2.      In paragraph 11 through 13 of Amegy's Motion to Dismiss, it asserts the Trustee's fraud claims against Amegy should be dismissed.[1]  This issue is now moot because the Trustee has filed the Amended Complaint removing the independently asserted fraud claims.  The facts previously supporting the independently asserted fraud claims are now pled in the Amended Complaint as additional facts supporting the Trustee's breach of fiduciary duty claims and continue to be used to support the Trustee's fraudulent transfer claims relating to actual intent to hinder, delay, and defraud.[2]  The Trustee is continuing to assert a claim against Speer, Amegy, Manners and other defendants relating to the aiding and abetting, conspiracy, and action-in-concert relating to the breach of fiduciary duty claims.

---

[1]The independent Fraud Claims set forth in the Complaint were in paragraphs 347 to 394.

[2]The additional facts supporting the breach of fiduciary duty claims and the fraudulent transfer claims are now in paragraphs 362 through 411of the Amended Complaint.

3.      Conspiracy,[3] aiding and abetting,[4] and concert-of-action[5] do not require proof of an

affirmative false statement or a fiduciary or special relationship by Amegy or Manners.

4.      Amegy's request to dismiss the Trustee's fraud action should be denied as moot.

### The Trustee did not Assert a Claim against Amegy for Breach of Contract Claims Associated with the Partnership Agreement

5.      In paragraph 15 of Amegy's Motion to Dismiss, Amegy asserts it is not a party to the

Partnership Agreement and thus cannot be held liable for breach of contract relating to

the Partnership Agreement.  The Trustee had not alleged a breach of contract claim

against Amegy relating to the Partnership Agreement.[6]  Paragraph 102 of the Amended

Complaint clarifies that Hammersmith is the only defendant being sued for breach of

contract.

---

[3]To prove a civil conspiracy in Texas, a plaintiff must satisfy the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. In re Webber, 350 B.R. 344, 366 (Bankr. S.D. Tex. 2006).

[4]To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship.  Floyd v. Hefner, 556 F. Supp. 2d 617, 655 (S.D. Tex. 2008).

[5]Two or more persons are jointly and severally liable when they jointly participate in concerted action to commit a common tort and accomplish their purpose. There are three methods by which a person may become liable under an acting-in-concert theory as set forth in Section 876 of the Second Restatement of Torts: (1) by committing a tortious act in concert with the other or pursuant to a common design with the other; (2) by giving substantial assistance or encouragement to the other to conduct himself or herself in a way that constitutes a breach of duty; or (3) by giving substantial assistance to the other in accomplishing a tortious result and acting in such a way that the person's own conduct, separately considered, constitutes a breach of duty to a third person. The following factors may be considered in determining whether a person gave substantial assistance to the other person: (1) the nature of the wrongful act; (2) the kind and amount of the assistance; (3) the relation of the defendant and the actor; (4) the presence or absence of the defendant at the occurrence of the wrongful act; and (5) the defendant's state of mind. McMillen Feeds, Inc. of Texas v. Harlow, 405 S.W.2d 123, 139 (Civ. App.--Austin 1966, ref. n.r.e.) ; Century 21 Page One Realty v. Naghad, 760 S.W.2d 305, 310 (Tex. App.--Texarkana 1988, no writ).

[6]See paragraph 97 of the Complaint.

6.      In paragraphs 16 to 19 of Amegy's Motion to Dismiss, Amegy asserts there is no claim for conspiracy, aiding and abetting, or concert-of-action relating to a breach of contract claim because these claims require an underlying tort.  The Trustee withdraws the specific issue of conspiracy, aiding and abetting, and concert-of-action as it relates solely to the breach of contract claim relating to the Partnership Agreement.  The Trustee continues to assert conspiracy, aiding and abetting, and concert-of-action relating to other claims against Amegy as set forth in the Amended Complaint.

7.      In paragraph 20 of Amegy's Motion to Dismiss, Amegy asserts Speer is not a party to the Partnership Agreement and therefore cannot be liable for breach of contract relating to the Partnership Agreement. The Trustee acknowledges Speer, Manners and Kopecky were included as defendants relating to the breach of contract claims regarding the Partnership Agreement. They cannot be liable for the breach of contract claim relating to the Partnership Agreement since they were not a party to the Partnership Agreement. Therefore, the Trustee has filed the Amended Complaint to only assert claims against Hammersmith in the breach of contract claims relating to the Partnership Agreement.

8.      Although not addressed in the Amegy Motion to Dismiss, the Trustee's Amended Complaint does not include the specific claim of conspiracy, aiding and abetting, and concert-of-action as it relates solely to the breach of contract claim against Speer, Manners and Kopecky relating to the Partnership Agreement.  The Trustee continues to assert breach of fiduciary duty claims against Speer, Manners, and Kopecky as set forth throughout the Amended Complaint. The Trustee also continues to assert conspiracy, aiding and abetting, and concert-of-action claims against Speer, Manners and Kopecky

and others relating to the breach of fiduciary duty claims as set forth throughout the Amended Complaint.

## Hammersmith Breached the Partnership Agreement

9.  In paragraphs 21 to 26 of Amegy's Motion to Dismiss, Amegy makes vague assertions and concludes Hammersmith had the authority to make the distributions that are at issue in this case.

10. In paragraph 21 of Amegy's Motion to Dismiss, Amegy seeks to limit the Trustee's allegations in the Complaint regarding the breach of contract claim relating to the Partnership Agreement when Amegy states, "In the Complaint, Trustee alleges that Hammersmith Group, LLC ("Hammersmith"), Speer, and others breached the Partnership Agreement by (1) making distributions from borrowed funds, and (2) expending Royce Homes's capital in furtherance of items other than the business of the partnership." While these are two of the Trustee's allegations, they are not the only allegations.

11. The Complaint actually stated the following:[7]

102.   *The Royce Homes Partnership Agreement (hereinafter referred to as Partnership Agreement):*

   a.   *prohibits distributions made from loans to Royce Homes;*

   b.   *requires distributions leave sufficient working capital reserve, including "amounts required to ensure full compliance with the terms of all loan covenants and agreements of [Royce Homes];"*

   c.   *requires the General Partner to act consistently with its fiduciary*

---

[7]This paragraph numbers in the Amended Complaint begin at paragraph 107.

*responsibility for the safekeeping and use of all Partnership Property; and*

d.    *limits the General Partner to expending the Partnership's capital and*

*revenues in furtherance of the business of the Partnership.*

12.    Hammersmith was restricted by the Partnership Agreement to only making distributions

from Available Cash.  The Complaint stated:[8]

103.    *The Partnership Agreement restricts Distributions and Tax Distributions such*

*that they may only be paid from Available Cash.*

104.    *Section 4.7, titled "Distributions," states in relevant part:*

*Except as otherwise provided in Section 9.4 hereof, **distributions of Available Cash** shall be made as follows:*

*(c)  Third, in the General Partner's sole discretion, to the extent there remains any **Available Cash**, it may be distributed to the Partners in proportion to their Partnership Interests." The General Partner has the authority to retain any amount of funds it deems advisable, in its sole discretion, in order to develop and expand the business of the Partnership. (Emphasis added).*

105.    *Tax Distributions are similarly limited to being paid from Available Cash.*

*Section 4.8, titled "Tax Distributions" states in relevant part:*

*no later than (i) fifteen (15) days after the end of each period for which an individual estimated federal income tax payment is due, and (ii) one hundred twenty (120) days after the end of each Fiscal Year, the Partnership shall make a cash distribution from **Available Cash** to the Partners in accordance with their interests in the smallest amount necessary so that the aggregate amount of distributions each Partner has received under this Agreement equals such Partner's Hypothetical Tax Amount."[9] (Emphasis added).*

---

[8]These paragraph numbers in the Amended Complaint begin at paragraph 108.

[9]The Tax Distribution is limited to the amount of tax due from the distributions of the partnership and does not include a tax due for other income of the partner.

106.    Available Cash is defined in Section 1.1(f) of the Partnership Agreement.  It

states:

> 'Available Cash' means all cash funds of the Partnership on hand from
> time to time (**other than** cash funds obtained as contributions to the
> capital of the Partnership by the Partners and **cash funds obtained from
> loans to the Partnership**) after (i) payment of all operating expenses of
> the Partnership as of such time, and (ii) **provision for a working capital
> reserve in an amount to be determined by the General Partner,
> including amounts required to ensure full compliance with the terms of
> all loan covenants and agreements of the Partnership**. (Emphasis
> added).

107.    The Partnership Agreement restricts the use of borrowed funds to a Partnership

purpose. Section 3.4(a) states in relevant part:

> **The proceeds of Partnership loans may be used for any Partnership
> purpose**, including, but not limited to, the payment of the costs related to
> partnership expenses or to refinance Partnership indebtedness. (Emphasis
> added).

108.    The Partnership Agreement describes the rights and duties of the General

Partner in Article 5.  Section 5.1(a) provides in relevant part:

> Except as otherwise provided in this Agreement but **consistent with the
> General Partner's fiduciary responsibility for the safekeeping and use of
> all Partnership Property**, the General Partner shall have the full and
> exclusive power and authority on behalf of the Partnership ....**to expend
> the Partnership's capital and revenues in furtherance of the business of
> the Partnership**. (Emphasis added).

109.    The Partnership Agreement is clear.  Royce Homes could not make Distributions

or Tax Distributions except from Available Cash. When distributions were made

from borrowed funds, they were not made from Available Cash.  When

distributions were made without leaving a working capital reserve in an amount

required to ensure full compliance with the terms of all loan covenants and

*agreements of the Partnership, they were not made from Available Cash.*

110. *Proceeds from Partnership loans could only be used for Partnership purposes. The General Partner of Royce Homes was required to act consistently with its fiduciary duties and, except as allowed by the Partnership Agreement, could only expend the Partnership's capital and revenues in furtherance of the business of the Partnership.*

111. *At all times relevant to this Complaint, the Breach of Partnership Defendants controlled Royce Homes and its General Partner, Hammersmith Group, Inc. The Breach of Partnership Defendants had a fiduciary duty to Royce Homes and Hammersmith Group. The Breach of Partnership Defendants breached the Partnership Agreement with respect to each of the preceding provisions.*

112. *The Breach of Partnership Defendants breached the Partnership Agreement when they made, or allowed to be made, the distributions for the Amegy principal payments of $10 million, $2.5 million, and another $2.5 million from January 2007 through January 2008. The Breach of Partnership Defendants breached the Partnership Agreement when they made, or allowed to be made, the distributions to make the Amegy interest payments beginning September 30, 2006 through the filing of this bankruptcy. The Breach of Partnership Defendants breached the Partnership Agreement in making, or allowing to be made, the payments to Manners beginning October 2, 2006 through the filing of this bankruptcy.*

13. Sections 4.7 and 4.8 of the Partnership Agreement are the only sections authorizing distributions. Hammersmith's discretion to make distributions was limited by these two

sections in that these two sections only allow distributions to be made from Available

Cash.  Section 4.7, titled "**Distributions**," states in relevant part:

> Except as otherwise provided in Section 9.4 hereof, **distributions of Available Cash** shall be made as follows:
>
>> (c)  Third, in the General Partner's sole discretion, to the extent there remains any **Available Cash**, it may be distributed to the Partners in proportion to their Partnership Interests." The General Partner has the authority to retain any amount of funds it deems advisable, in its sole discretion, in order to develop and expand the business of the Partnership. (Emphasis added).

14.     The literal reading of the first sentence of 4.7(c) is unambiguous.  The General Partner's

sole discretion is limited to the extent there remains any Available Cash.  The

distributions Amegy refers to in paragraph 22 the Motion to Dismiss were not made from

Available Cash because they were made from cash funds obtained from loans to the

Partnership, were made without provision for payment of all operating expenses of the

Partnership as of such time, and without provision for a working capital reserve in an

amount to be determined by the General Partner, including amounts required to ensure

full compliance with the terms of all loan covenants and agreements of the Partnership.[10]

15.     The payments Amegy refers to in paragraph 22 of its Motion to Dismiss were for

payment of John Speer's personal debt to Amegy and were not for partnership purposes.

16.     The Trustee's breach of contract claims relating to the Partnership Agreement are

plausible in that they are also based on the requirements that the general partner act

consistently with its fiduciary responsibility and within the limitations of the general

---

[10]See Partnership Agreement section 1.1(f) and Gathmann Excerpts 1 through 6, 9 through 11, 14, 16 through 28, 31 through 33, 44, and 46 through 48 attached to and incorporated into specific paragraphs of the Amended Complaint.

partner's authority to expend the partnership's capital and revenues in furtherance of the business of the partnership.[11]

17.     The Trustee has stated sufficient allegations and evidence to support a claim of breach of contract relating to the Partnership Agreement that is plausible on its face.  Therefore the Amegy Motion to Dismiss the breach of contract claims relating to the Partnership Agreement should be denied.

**Hammermith's Burden is to Prove Good Faith
and that it Acted in a Manner Reasonably Believed to be
Within the Scope of the Authority Granted to the General Partner
in the Partnership Agreement**

18.     Amegy asserts in paragraphs 27 through 29 of the Motion to Dismiss that the Trustee has the burden to prove bad faith and that his Complaint fails to set forth facts in support of bad faith.  Amegy asserts that the Trustee must prove, pursuant to Section 5.3 of the Partnership Agreement, that the general partner acted in bad faith.

19.     Section 5.3 is an exculpatory provision and only releases the general partner's liability if the general partner acts in good faith and in a manner reasonably believed to be within the scope of the authority granted to the general partner in the Partnership Agreement. Thus, it is an affirmative defense.  The general partner bears the burden of pleading and proving an affirmative defense.[12]

20.     In paragraph 28 of the Motion to Dismiss, Amegy even refers to Section 5.3 as a

---

[11]See Partnership Agreement sections 3.4(a) and 5.1(a).  See also, footnote 7 above for Gathmann Excerpts.

[12]McCall v. Scott 250 F.3d 997, 1000 (C.A.6, 2001) (holding an exculpatory clause requiring good faith is an affirmative defense and the defendant bears the burden of proof).  Citing Emerald Partners v Berlin, 726 A.2d 1215, 1223-24 (Del.1999) (since the protection of [an exculpatory] provision is in the nature of an affirmative defense, a defendant seeking exculpation bears the burden of establishing its elements.  As a result, it is not the plaintiff who must establish bad faith at trial, but the defendant who bears the burden.)

"release."[13]  Fed.R.Civ.P. 8(c) lists a release as an affirmative defense.  The party

asserting the affirmative defense has the burden to plead and prove the facts relating to

the defense.

21.     Allegations of good faith and reasonable belief are allegations of state of mind.

Allegations of state of mind including knowledge and intent need not be pled with

particularity but may be averred generally.[14]

22.     The Trustee has set forth sufficient facts which would satisfy the requirements of

Fed.R.Civ.P. 9(b).  The Amended Complaint sets forth with particularity clear and

unambiguous provisions in the Partnership Agreement i) prohibiting distributions from

loans to Royce Homes; ii) requiring distributions leave sufficient working capital reserve,

including amounts required to ensure full compliance with the terms of all loan covenants

and agreements of [Royce Homes];[15] iii) requiring the General Partner to act consistently

with its fiduciary responsibility; and iv) limiting the General Partner to expending the

Partnership's capital and revenues in furtherance of the business of the Partnership.[16]

23.     The Amended Complaint further sets forth the particular transactions which breached the

Partnership Agreement sections described in the previous paragraph and how those

transactions breached the Partnership Agreement.[17]

---

[13]See Motion to Dismiss, paragraphs 27 and 28.

[14]In re Parkcentral Global Litigation, 2010 WL 3119403 (N.D.Tex, 2010). (Unpublished opinion).

[15]This provision refers to loan agreements between Royce Homes and its lenders which require certain covenants, including debt to equity ratios which were not to be exceeded.

[16]See Amended Complaint Paragraph 107 through 116.

[17]See Amended Complaint Paragraph 117 through 185.

24.     Speer as President of Hammersmith Group was fully informed of the contents of the

Partnership Agreement.  On September 20, 2006, he certified, as President of

Hammersmith Group, that the Partnership Agreement was a true and complete copy of

the Partnership Agreement and that it had not been amended (except as shown) or

revoked and was in full force and effect.  It is this Partnership Agreement and its only

amendment that are attached as Exhibit A to the Amended Complaint.

25.     The allegations and facts asserted in the Amended Complaint do not support a defense

that Hammersmith acted in "good faith and in a manner reasonably believed by the

general partner to be within the scope of the authority granted to the general partner by

the [Partnership Agreement]."[18] In fact, the Amended Complaint shows facts supporting

an opposite conclusion.

26.     The Amended Complaint avers distributions were knowingly made with loans from

Royce Homes lenders:

a.      Paragraphs 122 and 123 of the Amended Complaint show Speer submitted "a

wire request, with his "Commercial Loan Payment Coupon" attached, to Royce

Homes's accounting department for the payment of the $10,000,000.00 principal

installment on his personal loan with Amegy Bank."

b.      In Paragraphs 122 and 123 of the Amended Complaint, through a series of emails

including Speer as a participant, the CFO of Royce Homes and other staff discuss

the payment of the January 2007 $10 million payment plus interest, that the funds

to distribute to Speer will be borrowed, and that this was to pay Speer's personal

---

[18]Quoting from Section 5.3 of the Partnership Agreement.

obligation to Amegy.  The Amended Complaint sufficiently shows borrowed funds were used to make distributions to Speer to pay his personal debt.

c.     Paragraphs 124 through 130 of the Amended Complaint show the borrowing of the funds from Royce Homes lenders, the wire transfer of the funds to Speer, and the acknowledgment of payment by Amegy.

d.     In paragraphs 147 through 154 of the Amended Complaint the Trustee has shown that the July 2007 $2.5 million Amegy payment distribution was from borrowed funds and in paragraphs 157 through 162 of the Amended Complaint that the January 2008 $2.5 million Amegy payment distribution was effectively from borrowed funds.

e.     In paragraphs 172 through 178 and Exhibit B of the Amended Complaint the Trustee shows the distribution to pay Speer's personal debt to Manners were from borrowed funds.

27.     The Amended Complaint avers distributions were knowingly made without leaving sufficient working capital reserve, including amounts required to ensure full compliance with the terms of all loan covenants and agreements of [Royce Homes], including debt to equity loan covenants:

a.     In paragraphs 130 through 184 of the Amended Complaint the Trustee has shown that the all of the distributions were made during a time when the loan covenants, including the debt to equity loan covenants were breached.

b.     In paragraph 222 of the Amended Complaint the Trustee has shown Speer knew Royce tracked its debt-to-equity ratio and he had access to this information, Speer

knew or should have known that Royce would be required to notify its lenders if it was in breach of its debt-to-equity loan covenants, Speer did not check to determine if he was breaching Royce's debt-to-equity ratios by making his partnership distributions even though he understood that Royce was likely out of compliance with its loan covenants, and Speer was also aware the financial projections for Royce fell short by a large degree for 2006  but, he made the distributions to pay his personal debt anyway. The projections for 2007 and 2008 were missed by an even greater degree.

c.     In paragraphs 136 through 143 of the Amended Complaint the Trustee has shown Speer was advised by the CFO of the violation of the debt to equity ratios, that the CFO recommended a presentation to Royce Homes's lenders, and that Speer even sought a delayed payment based on Royce Homes's financial conditions.

d.     Paragraphs 232 through 241 of the Amended Complaint show the CFO and Speer are discussing the loan covenant breaches and the problems resulting from the distributions.

e.     Paragraph 248 of the Amended Complaint shows Speer acknowledging the negative impact of the distributions on Royce Homes when he states, "I need the deferrals to minimize the impact of the equity reductions from the company that would result in busting our debt equity covenants with our construction lenders."

f.     Paragraph 252 of the Amended Complaint shows, "Speer told Denison Royce Homes was breaching basically all of its debt-to-equity ratios. According to Denison, by October 2007 some of Royce Homes's loans were modified to allow

debt-to-equity ranging from 5.5 to 6.75 to 1.  Amegy calculated that despite the

modification, Royce Homes's ratios appeared to have jumped to 10 to 1."

28.     The Amended Complaint avers distributions were knowingly made when the General

Partner was not acting consistently with its fiduciary responsibility for the safekeeping

and use of all Partnership Property.  It further avers that despite the limitation that the

General Partner only expend the Partnership's capital and revenues in furtherance of the

business of the Partnership, Speer depleted Royce Homes's equity paying his personal

debt.

29.     The following list of Gathmann Excerpts attached to and incorporated into specific

paragraphs of the Amended Complaint show it would be evident to the general partner

the distributions were not consistent with the general partner's fiduciary responsibility

and that the capital and revenues were not being expended in furtherance of the business

of Royce Homes.  Gathmann Excerpts 4, 16 through 20, 22, 24 through 27, 31 through

33, 40, 44, and 48 show the funds were not consistent with the general partner's fiduciary

responsibility and the distributions were not in furtherance of the business of Royce

Homes.

30.     The Trustee does not have the burden to prove the general partner did not act in good

faith and in a manner reasonably believed to be within the scope of the authority granted

to the general partner in the Partnership Agreement.  However, the Amended Complaint

presents sufficient allegations and evidence to support that Hammersmith is not entitled

to the exculpatory protection of Section 5.3 of the Partnership Agreement.

31.     Amegy's Motion to Dismiss should be denied.

**The Trustee has Properly Stated Claims for Breach of Fiduciary Duty**

32.     In paragraphs 31 through 36 of the Motion to Dismiss, Amegy claims that since there

was no breach of contract, the breach of fiduciary duty claim must fail.  This is wrong for

a number of reasons.

33.     First, as shown above, in paragraphs 19 to 32, there was a breach of contract relating to

the Partnership Agreement.

34.     Second, this is not a Lopez[19] situation where the breach of fiduciary duty claims were

based entirely upon the breach of contract claims.  The Trustee has also pled separate

fiduciary duties owed to Royce Homes based on i) duty of loyalty, ii) duty of care, iii)

violations of the Act, and iv) violations of Delaware common law.[20]

35.     Third, in addition to claims against Hammersmith, the Trustee has asserted claims against

Speer, Manners, and Kopecky as fiduciaries and Amegy, Speer, Manners, Kopecky, and

Hammersmith Group as being the conspirators, aiders and abettors, and actors in concert

for the breach of the fiduciary duty claims.  Speer, Manners, and Kopecky did not sign

the Partnership Agreement in their individual capacity; however, they owed fiduciary

duties to Royce Homes because they were officers of Royce Homes.[21]  Speer and

Kopecky also owed a fiduciary duty because they were officers of the general partner.

---

[19]Amegy cites Lopez v Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857 (Tex. 2000) for the proposition that if the breach of fiduciary duty claim is based entirely on a breach of contract claim, there can be no breach of fiduciary duty if there is not breach of contract.

[20]See Amended Complaint, paragraphs 195 through 199.

[21]In re World Health Alternatives, Inc., 385 B.R. 576 (Bankr. D. Del. 2008).  Bigelow/Diversified Secondary Partnership Fund 1990 v. Damson/Birtcher Partners, 2001 WL 1641239 (Del.Ch. 2001); Wallace v. Wood, 752 A.2d 1175,1181 (Del.Ch, 1999).

Speer owed a fiduciary duty because he was the sole director of the general partner.[22]

Speer, Manners, and Kopecky were control persons and employees of Royce Homes.

The Trustee has alleged sufficient facts to support these allegations.[23]

36.   Fourth, as set forth in paragraphs 208 through 316 of the Amended Complaint, the

Trustee sets forth "Additional Facts Relating to Breach of Fiduciary Duty" which show

the Trustee's breach of fiduciary duty claims are not solely based on breach of contract

claims relating to the Partnership Agreement.

37.   Fifth, in paragraphs 317 to 334 of the Amended Complaint the Trustee summarized that

the duties of loyalty and duty of care were breached and the resulting damages for each

of the breaches.

38.   Throughout the Amended Complaint, the Trustee has made breach of fiduciary

allegations and stated supporting facts which expand far beyond the breach of contract

relating to the Partnership Agreement and against defendants who were not a party to the

Partnership Agreement.

39.   Amegy's Motion to Dismiss should be denied.

### The Trustee Properly Stated Why the Fiduciaries are Not Entitled to the Benefit of the Business Judgment Rule

40.   In paragraph 37 of Amegy's Motion to Dismiss, Amegy states:

37.   For the purposes of this Court's fiduciary duty analysis, it is also important to note that Trustee's pleading regarding the business judgment rule is incorrect.  In Paragraph 197 of the Complaint, Trustee states (without citation):

---

[22]Cede & Co. v. Technicolor, Inc., 634 A.2d 345 (Del. 1993) decision modified on reargument, 636 A.2d 956 (Del. 1994). Zoren v. Genesis Energy, L.P., 836 A.2d 521 (Del.Ch. 2003).

[23]See Amended Complaint paragraphs 29, 58, 59, 73, 74, 76, 195, 196, 197, 262, 271, 272, 288, 304, 347(b), and 380.

> The business judgment rule does not apply to the Fiduciaries in the transactions mentioned above because the Fiduciaries were not disinterested parties, the Fiduciaries appeared on both sides of the transaction, they derived personal financial benefit from their self-dealing as opposed to legitimate benefit.

Complaint, at 48.

41.     Amegy does state how the Trustee's pleading is incorrect.

42.     The [Business Judgment Rule] operates as both a procedural guide for litigants and a substantive rule of law. As a rule of evidence, it creates a "presumption that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company." The presumption initially attaches to a director-approved transaction within a board's conferred or apparent authority in the absence of any evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment."[24]

43.     The [Business Judgment Rule] posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose." Thus, a shareholder plaintiff challenging a board decision has the burden at the outset to rebut the rule's presumption. To rebut the rule, a shareholder plaintiff assumes the burden of providing evidence that directors, in reaching their challenged decision, breached any one of the triads of their fiduciary duty-good faith, loyalty or due care. If a shareholder plaintiff fails to meet this evidentiary burden, the business judgment rule attaches to

---

[24]Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 360 (Del. 1993) decision modified on reargument, 636 A.2d 956 (Del. 1994).

protect corporate officers and directors and the decisions they make, and our courts will not second-guess these business judgments.  If the rule is rebutted, the burden shifts to the defendant directors, the proponents of the challenged transaction, to prove to the trier of fact the "entire fairness" of the transaction to the shareholder plaintiff.[25]

44.    Under the entire fairness standard of judicial review, the defendant directors must establish to the court's satisfaction that the transaction was the product of both fair dealing and fair price.[26]

45.    [The Business Judgment Rule's] protections can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment. From the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.[27]

46.    A controlling or dominating shareholder standing on both sides of a transaction ... bears the burden of proving its entire fairness.[28]  The initial burden under entire fairness is borne by the controlling party who stands on both sides of the transaction.[29]

47.    A director or officer is interested if he either: (1) stands on both sides of the transaction;

---

[25]*Id* at 361.

[26]*Id* at 361.

[27]Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984) overruled by Brehm v. Eisner, 746 A.2d 244 (Del. 2000)

[28]Orman v. Cullman, 794 A.2d 5, 20 (Del. Ch. 2002)

[29]*Id* at 20.

or (2) expects to derive a personal financial benefit from the transaction.[30] However, if with regards to this element of the business judgment rule, it can be shown that an officer or director's decision was interested, then the protections of the business judgment rule do not apply.[31]  As previously stated, if the Business Judgment Rule does not apply the Defendant must prove the entire fairness of the transaction.  The burden of pleading and proving that there was no breach is now the Defendant's under the entire fairness doctrine.

48.  There are two aspects of the entire fairness inquiry: fair dealing and fair price.[32] "Fair dealing" focuses on the actual conduct of the corporate fiduciaries in effecting the transaction.[33] This includes how the transaction was initiated, structured and negotiated and the timing of the transaction. "Fair price" relates to the economic and financial considerations of the transaction.[34] Courts have held that this element requires proof that "the price offered was the highest value reasonably available under all the circumstances."[35] The test for fairness is not bifurcated, i.e., a Defendant must prove both fair dealing and fair price.[36]

49.  The Trustee correctly stated the law and the reason why the business judgment rule does

---

[30]Roselink Investors, 386 F.Supp.2d at 217 (citing Aronson, 473 A.2d at 812).

[31]In re PSE & G, 801 A.2d 1261, 1280 (Del. 1989).

[32]Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del.1983).

[33]Id at 711. See also, Mills Acquisition Co. v. Macmillan, 559 A.2d 1261, 1280 (Del.1989).

[34]Id at 711.

[35]Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del.1993).

[36]Weinberger, 457 A.2d at 711.

not apply in this instance.

**The Partnership Agreement Does Not
Eliminate the Statutory or Common Law Fiduciary Duties**

50.     In paragraphs 38 through 39 of the Motion to Dismiss, Amegy is wrong when it states,

"Even if the breach of fiduciary duty claims survive, the claims alleged by the Trustee

against Amegy Bank and Amegy Mortgage must be based solely on the fiduciary duties

explicitly listed in the Partnership Agreement."  Amegy has this backwards.

51.     The default fiduciary duties apply under Delaware law unless the Partnership Agreement

explicitly eliminates them. If the Partnership Agreement does not have a clear and

unambiguous provision that eliminates the operation of traditional fiduciary duties the

traditional fiduciary duties continue to apply.[37]

52.     In <u>Kelley v Blum</u>, the Court held, an LLC agreement did not specifically eliminate the

traditional fiduciary duties and therefore the duties continued to apply when the LLC

Agreement provided:

> [t]he Board of Managers shall manage the affairs of the Company in a prudent
> and businesslike manner and shall devote such time to the Company affairs as
> they shall, in their discretion exercised in good faith, determine is reasonably
> necessary for the conduct of such affairs.
>
> [i]n carrying out their duties hereunder, the Managers shall not be liable for
> money damages for breach of fiduciary duty to the Company nor to any Member
> for their good faith actions or failure to act ... but only for their own willful or
> fraudulent misconduct or willful breach of their contractual or fiduciary duties
> under this Agreement.

53.     In <u>Atlas Energy Res., LLC</u> the Court stated, "Delaware's case law clearly teaches that, 'in

---

[37]<u>Kelly v. Blum</u>, 2010 WL 629850, 10-12 (Del. Ch. Feb. 24, 2010) (Unpublished opinion). See also <u>In re
Atlas Energy Res., LLC</u>, 2010 WL 4273122, 6-9 (Del. Ch. Oct. 28, 2010)

the absence of provisions in the LLC agreement explicitly disclaiming the applicability of

default principles of fiduciary duty, controlling members in a manager-managed LLC

owe minority members the traditional fiduciary duties that controlling shareholders owe

minority shareholders.'"[38]

54.     The default fiduciary duties apply unless there is an explicit provision eliminating them.

Thus, if a partnership agreement does not address the issue, the default fiduciary duties

apply.  However, the Royce Homes Partnership Agreement expressly includes Delaware

statutory and common law.

> 2.1 **Formation**. The Partnership has been formed as a limited partnership under
> the Act. *The rights, duties and liabilities of the Partners shall be as provided in
> the Act,[39] except as otherwise provided herein*.

> 12.4 **Governing Law, Successors, Severability**. *The internal affairs of the
> Partnership and the relative rights of the parties to this Agreement shall be
> governed by the laws of the State of Delaware, as such laws are applied by
> Delaware courts to agreements entered into and to be performed in Delaware by
> and between residents of Delaware,* and shall, subject to the restrictions on
> transferability set forth herein, bind and inure to the benefit of the heirs,
> executors, legal representatives, successors and assigns of the parties hereto. All
> other rights and remedies shall be governed by the laws of the State of Texas. If
> any provision of this Agreement shall be held to be invalid, the remainder of this
> Agreement shall not be affected thereby.

> (Emphasis added).

55.     No provision of the Partnership Agreement including Sections 5.1 and 5.3 explicitly

---

[38]Atlas Energy at 7. See also, Footnote 58, "That the LLC Agreement expressly eliminates the fiduciary duties of some individuals and entities does not lead to the conclusion that the fiduciary duties of others are eliminated by implication."

[39]Partnership Agreement, Section 1.1(a) "Act' shall mean the Delaware Revised Uniform Limited Partnership Act; Del. Code Ann. Title 6 §§. 17-10l to 17-1111, as from time to time amended.

eliminates fiduciary duties for Hammersmith, Speer, Manners or Kopecky.[40]

56.    Amegy's Motion to Dismiss should be denied.

### The Trustee Asserts a Broad Range of Fraudulent Transfer/Conveyance Claims based on 11 U.S.C. §§548, 550 and TUFTA and DUFTA

57.    The Trustee alleged numerous fraudulent transfers under Sections 548 and 550 of the Bankruptcy Code, the Texas Uniform Fraudulent Transfer statute (TUFTA), and the Delaware Uniform Fraudulent Transfer Statute (DUFTA).

58.    Amegy is only contesting the Trustee's Complaint as it relates to Section 548(a)(1)(B) of the Bankruptcy Code but is not contesting the Trustee's Complaint as it relates to TUFTA or DUFTA.

59.    Amegy also acknowledges that the Trustee's Complaint meets the pleading standards for recovery based on unreasonably small capital pursuant to 11 U.S.C. §548(a)(1)(B)(ii)(II).

60.    Amegy then claims:

> There are no factual allegations regarding the other prongs–insolvency, debts beyond Debtor's ability to pay as they matured, and making transfers for the benefit of an insider under an employment contract.

61.    Amegy purports that even though the Trustee has made allegations, he has not pled sufficient facts to assert claims under 11 U.S.C. §548(a)(1)(b)(ii)(I) relating to insolvency, §548(a)(1)(b)(ii)(III) relating to inability to pay debts as they become due, and §548(a)(1)(b)(ii)(IV) relating to employment contracts.

62.    Amegy does not contest the Trustee's allegations and facts relating to a recovery under

---

[40]See Kelly v. Blum, 2010 WL 629850, 10-12 (Del. Ch. Feb. 24, 2010) (Unpublished opinion)

11 U.S.C. §548(a)(1)(A) relating actual intent to hinder, delay, and defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.  In the Amended Complaint, the Trustee has added a section titled "Actual Intent to Hinder, Delay, and Defraud" to further support his allegations.

63.     With respect to 11 U.S.C. §548(a)(1)(b)(ii)(I) the Trustee has added a section beginning on paragraph 485 in the Amended Complaint titled "Insolvency of Royce Homes and Park Lake" and pleads sufficient facts to support a claim relating to insolvency.

64.     With respect to 11 U.S.C. §548(a)(1)(b)(ii)(III) relating to inability to pay debts as they become due the Trustee's Amended Complaint, beginning on paragraph 483, has a section titled "Incurring Debts Beyond Royce Homes's Ability to Pay" pled sufficient facts to support a fraudulent transfer claim for the distributions made on or about January 2008 because Royce Homes could not pay its debts as they became due. The Trustee has shown sufficient facts to present a plausible claim for fraudulent transfer.

65.     With respect to 11 U.S.C. §548(a)(1)(b)(ii)(IV) relating to employment contracts the Trustee has pled sufficient facts to support a fraudulent transfer claim for the distributions to Manners relating to his employment contract in paragraphs 570 through 587 of the Amended Complaint.  He also pled sufficient facts to support a fraudulent transfer claim for the distributions to Donnie Lou Speer relating to her employment contract in paragraphs 596 through 608 of the Amended Complaint.

66.     Amegy's request in its Motion to Dismiss, paragraph 42, that the Court limit the Trustee's recovery under Section 548 to unreasonably small capital should be denied.

**Prayer**

The Trustee has set forth in his Amended Complaint plausible facts why the Trustee is entitled to recover against Amegy and has demonstrated the validity of the claims in the Complaint.  Further, the Trustee has refuted Amegy's Motion to Dismiss and shown no claims should be dismissed with the exception of the breach of contract claims against the parties not signatories of the Partnership Agreement and the conspiracy/aiding and abetting/concert-of-action claims associated solely with the breach of contract claims.

Respectfully submitted this 17th day of June, 2011.

**CAGE HILL & NIEHAUS, LLP**

By:/s/ Michael Duncan
Michael Duncan
Texas Bar No. 06218700
Cage, Hill & Niehaus, L.L.P.
5851 San Felipe, Suite 950
Houston, TX 77057
Telephone:   (713) 789-0500
Telecopier:   (713) 974-0344

**JONES MORRIS KLEVENHAGEN, LLP**

By:/s/ Erin E. Jones
Erin E. Jones
Texas Bar No. 24032478
Jones Morris Klevenhagen, LLP
6363 Woodway Suite 570
Houston, TX 77057
Telephone:   (713) 589-5061
Telecopier:   (713) 589-5513

**TOW & KOENIG, PLLC**

By: /s/ Julie Koenig
Julie Koenig
Texas Bar No. 14217300

Rodney Tow
Texas Bar No. 20152500
Fed. Id: 3196
26219 Oak Ridge Drive
The Woodlands, TX 77380
Telephone:   (281) 681-9100
Telecopier:   (832) 482-3979
**COUNSEL FOR RODNEY TOW, CHAPTER 7
TRUSTEE FOR THE ESTATE OF ROYCE
HOMES, L.P.**

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 17th day of June 2011, a true and correct copy of the foregoing Objection was served via ECF/PACER to all parties registered to receive such service and/or by US mail first class postage prepaid as follows:

George R Gibson
Nathan Sommers Jacobs PC
2800 Post Oak Blvd
61st Flr
Houston, TX 77056-6102
COUNSEL FOR AMEGY BANK, N.A.,
AMEGY MORTGAGE COMPANY, LLC

C Ed Harrell & Steven Douglas Shurn
Hughes Watters & Askanase
Three Allen Center
333 Clay, 29th Floor
Houston, TX 77002
COUNSEL FOR JOHN H. SPEER,
VESTALIA, LLC

Christopher Donald Johnson
McKool Smith P.C.
600 Travis St.
Suite 7000
Houston, TX 77002
COUNSEL FOR DONNIE LOU SPEER

Michael J. Durrschmidt
Hirsch & Westheimer
700 Louisiana
25th Fl

Houston, TX 77002-2728
COUNSEL FOR HAMMERSMITH  GROUP, LLC,
PARK LAKE COMMUNITIES

Marc J. Magids
Zukowski, Bresenhan & Sinex, L.L.P.
1177 West Loop South
Suite 1100
Houston, TX 77027
COUNSEL FOR GEORGE KOPECKY,
WATERMARK LAND LLC,
WATERMARK TORTUGA, LLC

 Peter Johnson
Law Offices of Peter Johnson
Eleven Greenway Plaza
Suite 2820
Houston, TX 77046
COUNSEL FOR MICHAEL MANNERS,
ALLARD INVESTMENT COMPANY, LLC,
DMW HOLDINGS, INC.,
MGM MOTOR SPORTS, LLC,
SARACEN HOLDINGS, INC.


                                    /s/ Erin E. Jones
                                    Erin E. Jones